748 F.2d 427
 Gloria R. SMITH, Appellee,
v.
Ronald E. SORENSEN, Commissioner of Labor, Department of
Labor, State of Nebraska; William R. Loder, Director,
Comprehensive Employment & Training Unit, Department of
Labor, State of Nebraska; Department of Labor, State of
Nebraska; Director of the Merit System of the State of
Nebraska; and State of Nebraska, Appellants.
Richard GETTEMY and Donna Polk, Appellees,
v.
Ronald E. SORENSEN, et al., Appellants.
James L. BAUDLER, Appellee,
v.
Ronald E. SORENSEN, et al., Appellants.
 Nos. 83-2136, 83-2138 and 83-2139.
 United States Court of Appeals,
Eighth Circuit.
 Submitted April 10, 1984.
Decided Nov. 5, 1984.
Rehearing and Rehearing En Banc Denied Dec. 6, 1984.
 
 Mark D. Starr, Lincoln, Neb., for appellants.
 Donn E. Davis and Steven D. Burns, Lincoln, Neb., for appellees.
 Before LAY, Chief Judge, and McMILLIAN and JOHN R. GIBSON, Circuit Judges.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Gloria R. Smith, Richard Gettemy, Donna Polk and James L. Baudler, employees of the Comprehensive Employment Training Unit (CETA), a division within the Nebraska Department of Labor, were notified that they were to be laid off. They were so selected because a reduction in force guideline limited consideration of their seniority only to time with CETA instead of the entirety of their employment with the Department and also similarly limited their "bumping rights." They brought suit against Ronald Sorensen, Commissioner of Labor, State of Nebraska; William R. Loder, Director, Comprehensive Employment & Training Unit; the Department of Labor, State of Nebraska; the Director of the Merit System of the State of Nebraska; and the State of Nebraska under 42 U.S.C. Sec. 1983 (1982) claiming that because of the limitation of their seniority rights there was a deprivation of due process of law in the attempted layoffs and an impermissible impairment of their employment contracts by the state and its officials. The district court, after issuing preliminary injunctions restraining the layoffs, entered orders determining that all plaintiffs were entitled to retention points based on their total service with the Department of Labor instead of CETA service alone. It further determined bumping rights and awarded attorneys' fees. The district court also found that Baudler was included in the layoff in part because he was a Democrat during a Republican administration. The state, its departments, and its officers appeal. We reverse.
 
 
 2
 Smith, Gettemy, Polk and Baudler were employed by the CETA Division of the Nebraska State Department of Labor. CETA was formed in 1974 to administer federally funded employment programs. All four employees had transferred into CETA from other positions in the Department of Labor. In 1981, Loder, the Director of CETA, decided to reorganize the Division because of anticipated decreased funding and prepared a reduction in force (RIF) guideline. After Loder sent notifications of termination to Gettemy, Smith and Polk, they filed suit, and the district court preliminarily enjoined such termination. The RIF was suspended but reinstituted by Loder in late November with respect to other employees, including Baudler. After Baudler filed suit, the court issued a temporary restraining order preventing his layoff.
 
 
 3
 In early 1981, the Commissioner of Labor of Nebraska, John Hanlon, had requested that Loder prepare guidelines for a RIF for CETA. Loder testified that the RIF was instituted not only because of an anticipated reduction in funds but also because of his desire to change the management structure of the division so that a greater proportion of the division's budget would be spent for the delivery of programs to the recipients and less on program administration. The revised structure of CETA eliminated the positions of Gettemy, the Administrative Services Manager, and Baudler, the Planning Manager. The RIF guideline defined the order of layoff for CETA employees by using a retention point calculation based on the time of service each employee had with the Division. Commendable ratings also entitled the employees to additional points. The guideline provided for rank-ordered bumping rights to the same classification in another organizational unit or a sub-unit, or to the next lower position in the same class series.[1] In the absence of these two situations, the employee was entitled to bump to a classification previously held while continuously employed by CETA if the classification was still being used in CETA at the time of the bumping.
 
 
 4
 At trial, Smith, Gettemy, Polk and Baudler argued they were entitled to more retention points than they were awarded under the RIF guideline because they should have been given seniority for service in all divisions of the Department of Labor. Gettemy, Baudler and Polk all claimed broader bumping privileges than the state and its officials granted. Gettemy and Baudler claimed a right to bump to the Operations Manager position in CETA; Polk claimed bumping rights to a personnel officer position or to similar positions in any division of the Department of Labor or any other Merit System agency.
 
 
 5
 In its opinion, the district court first determined that appellees possessed a property interest in continued employment that would be protected by the fourteenth amendment. After pointing out that all agreed that the plaintiffs possessed property rights in retention points equal to those granted in the RIF guideline, the court further determined that "the reasonable interpretation of the present [Merit System] Rules entitles each of the plaintiffs to a reasonable expectation that he or she would receive retention points calculated on their entire tenure with the Department of labor." The district court also found that all the employees had transferred to CETA with assurances that they would retain their seniority. The court separately analyzed the bumping rights of Gettemy, Baudler and Polk, finding that Gettemy had a right to bump to the Operations Manager position in CETA and, eventually, that Polk had a right to bump to a Personnel Officer II position in CETA. The district court also found that Baudler was included in the layoff in part because of his political affiliation and that an inclusion so motivated constituted a deprivation of a protected right.
 
 
 6
 The district court then concluded that the employees had been deprived of these rights without due process of law. It rejected the argument that adequate due process was available through the Merit System rules, which provided for appeal to the Merit Council and a resulting recommendation to the appointing authority. It concluded:
 
 
 7
 The role of the Merit Council is advisory only; the appointing authority--in this case the CETA Division of the Department of Labor--remained the ultimate judge of the propriety of its decision. There is no neutral arbiter able to make a decision that is binding on the CETA Division. This is not to say that Merit System Rule 13(9) is violative of due process; it is only to say that the appeal process of that Rule does not provide a process adequate in itself to constitute a sufficient substitute for an effective pretermination process.
 
 
 8
 The district court next found that the 1978 Merit System rules created express contracts of employment. It determined that the defendants had impermissibly impaired such contracts in their improper calculation of retention points, denial of bumping rights to Gettemy and Polk, and political discrimination against Baudler.
 
 
 9
 The district court further found that Baudler had no claim under the first amendment to be free from inclusion in the layoff because of his political affiliation. It held that under the test of Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), Baudler was in a policymaking position, one not constitutionally protected from patronage-based decisions.
 
 
 10
 The district court finally concluded that it need not give great weight to the interpretation of the rules by the Merit System. It then proceeded to spell out the extent of relief for each of the individuals. All were declared entitled to retention points based on their total length of service with the Department of Labor. Their bumping rights were limited to positions within CETA and not to positions in other divisions of the Department of Labor or elsewhere in the state government. Gettemy was declared entitled to injunctive measures to insure that he was considered to have held the Operations Manager position. Baudler was entitled to a declaration that his inclusion in the layoff was affected by his political affiliation. He was entitled to bump to a Planning Specialist position without reduction of pay, since that otherwise would penalize him because of his political affiliation. Polk was eventually found to be entitled to bump to a Personnel Officer II position in CETA. The district court awarded Baudler, Polk and Gettemy attorneys' fees of $29,930.25 and costs and expenses of $852.97. Smith was awarded attorneys' fees, costs and expenses of $29,593.21.
 
 
 11
 The state, its departments, and its officers have appealed, arguing that the court erred in each of its conclusions supporting the judgment. Baudler has not appealed from the adverse ruling on his first amendment claim.
 
 I.
 
 12
 The state and its officers argue that the district court erred in declaring that the employees were entitled to have their retention points calculated upon their total time of service with the Department of Labor as opposed to that with CETA. The district court based its determination upon its interpretation of the Merit System rules. It properly looked to such rules in determining the extent of the employees' property interests, since such interests are created by, and their dimensions and sufficiency are judged by, "state law--rules * * * that secure certain benefits and * * * support claims of entitlement." Board of Regents v. Roth, 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972); see Bishop v. Wood, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976). In Nebraska, such state law holds that a property interest may arise for a state public employee from the rules and regulations which have become a part of his employment contract. Weeks v. State Board of Education, 204 Neb. 659, 663, 284 N.W.2d 843, 846 (1979).
 
 
 13
 Since the rules were promulgated under the authority of Nebraska's Administrative Procedures Act, Neb.Rev.Stat. Secs. 84-901-919 (1981), they are as binding as if they were statutes. Douglas County Welfare Administration v. Parks, 204 Neb. 570, 284 N.W.2d 10 (1979). The district court correctly found that the Merit System rules so promulgated constituted an express contract between the state and the employees. See United States Trust Co. v. New Jersey, 431 U.S. 1, 17, 97 S.Ct. 1505, 1515, 52 L.Ed.2d 92 (1977) (a statute is treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the state). The provisions of contracts so arising from and so authorized by law cannot be waived by officers of the state beyond the express authority given them. In re Roadmix Construction Corp., 143 Neb. 425, 432, 9 N.W.2d 741 (1943); City of Plattsmouth v. Murphy, 74 Neb. 749, 752, 105 N.W. 293 (1905). Such unauthorized assurances are void and unenforceable and therefore insufficient to support a claim of entitlement to government employment. Bollow v. Federal Reserve Bank, 650 F.2d 1093, 1099 (9th Cir.1981), cert. denied, 455 U.S. 948, 102 S.Ct. 1449, 71 L.Ed.2d 662 (1982). Thus, the testimony in the district court regarding representations made to the appellees by their superiors at the times they transferred to CETA need not further concern us.[2]
 
 
 14
 The question whether the Merit System rules were properly applied involves interpretation of the rules and is a question of law. Because parties have an equal right to have questions of state law reviewed on appeal, we are not bound by the district court's interpretation or to a clearly erroneous standard of review. Hughes v. Whitmer, 714 F.2d 1407, 1415 (8th Cir.1983) (citing Luke v. American Family Mutual Insurance Co., 476 F.2d 1015, 1019 n. 6 (8th Cir.1972)), cert. denied, --- U.S. ----, 104 S.Ct. 1275, 79 L.Ed.2d 680 (1984). We first observe that the RIF guideline was drawn by the CETA Personnel Officer. He testified that he based his calculation of retention points on CETA service alone because of his reading of the Merit System rules and his conversations with the Merit System offices. There was also testimony that this interpretation of the rules by CETA was adopted by the Merit System. The CETA RIF guideline was a restatement of Merit System Rule 12 and the interpretation given to it by the agency responsible for it. The district court specifically declined to give weight to the Merit System's interpretation. The Supreme Court has held, however, that when a case "involves an interpretation of an administrative regulation a court must necessarily look to the administrative construction of the regulation if the meaning of the words used is in doubt." Bowles v. Seminole Rock & Sand Co., 325 U.S. 410, 413-14, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945) (emphasis added). We have held that an agency's interpretation of its own regulations should be given "significant weight," Builders Steel Co. v. Marshall, 575 F.2d 663 (8th Cir.1978), and that, although a question of law, such interpretation should be accorded "great deference." Murphy Oil Corp. v. Federal Energy Regulatory Commission, 589 F.2d 944, 948 (8th Cir.1978).
 
 
 15
 In construing the present Merit System rules, the district court began by looking to earlier versions of the rules. The 1971 Merit System rules provided:
 
 
 16
 3. To the average service rating, add one point for each month of seniority as defined below, and for each month of active military service of the United States, which occurs as a break in the employee's continuous service with the agency. * * * (For employees of the Division of Employment this service shall include service within the State of Nebraska with the National Re-employment Service, Division of Placement and Unemployment Insurance, Nebraska State Employment Service, United States Employment Service, War Manpower Commission, and Division of Employment Security.)
 
 
 17
 4. For an employee who has not had a break in service, seniority shall mean the total months of continuous service. For seniority purposes an employee who has been rehired after an involuntary break shall be given credit for all months actually on duty, plus active military service, as defined above. An employee who has been rehired after a voluntary break in service shall be given credit for all months of service from the date of reemployment. An employee shall be considered to have had a voluntary break in service when he separates himself from the agency at any time prior to receiving a written notice from the appointing authority stating that his job has been abolished or his services are terminated. The employee's total years of service with the Joint Merit System agencies shall be used rather than length of service in his present classification.
 
 
 18
 Article XII, Sec. 4, p (2)(c)(3) & (4). The district court stated that Article XII, Sec. 4, p (2)(c)(4) of the 1971 Rules provided that retention points were to be "based on 'the employee's total years of service with Joint Merit System agencies,' " as opposed to years of service with an agency.
 
 
 19
 We believe that this single sentence relied on by the district court must be read in the context of the rest of the paragraph of which it is a part, (2)(c)(4), the preceding paragraph (2)(c)(3), and the evident interrelationship of the two. Paragraph (2)(c)(4) bases seniority on "continuous service." While the term was not defined in the definitional section of the rules, paragraph (2)(c)(3), dealing with the calculation of seniority points for military service, referred to "continuous service with the agency," (emphasis added) that is, service within a particular Merit System agency. The second sentence in paragraph (2)(c)(4) in referring to military service also specifically referred to the definition in preceding paragraph (2)(c)(3). Further, in discussing a voluntary break in service, in the sentence immediately before that relied on by the district court there was specific reference to separation "from the agency."
 
 
 20
 Further, in paragraph (2)(c)(3), the rules expressly provided for service credits outside their agency for employees in the Division of Employment. If credit had been intended to be given for prior service in all Merit System agencies, there would have been no reason to establish this unique provision for the Division of Employment. When read in the full context of the two complete paragraphs, the sentence relied upon by the district court must be interpreted as referring to a limited issue: whether service is to be based on total years of service with the agencies in the sense of any one of the agencies making up the Joint Merit System, as opposed to a particular classification within an agency. This is a far more restricted issue and does not support the conclusion that retention points are to be based on service with all of the agencies.
 
 
 21
 The district court found that a letter had been written by the Merit System Director on May 22, 1974 stating that seniority rights apply only to the particular agency and do not transfer. It rejected this interpretation because of its own view of the meaning of the rules and because of the various statements made by the superiors of the employees in question. In view of our conclusions concerning the interpretation of the 1971 rules, which differ from that of the district court, we are satisfied that this interpretation should be given considerable weight.
 
 
 22
 The district court next discussed the construction to be given Rule 12(1)(c)(iii)(A) of the 1978 Rules, which was in effect at the time the RIF guideline was drawn up. The rule provides that:
 
 
 23
 Length of service credit shall be allowed at a rate of one (1) point for each month of service. For the purpose of computing length of service credits, the Appointing Authority shall include all continuous periods of employment between the date of original appointment and the date of layoff. Approved leaves of absence without pay, suspensions without pay and layoffs for periods exceeding fourteen (14) calendar days shall not be counted; however, the periods of service immediately preceding and that immediately following such leaves of absence and layoffs shall be counted. An employee who is returned to duty following approved military duty shall have all periods of military service counted as continuous service. Part-time employment shall receive pro-rata service credit (emphasis added).
 
 
 24
 The term "original appointment" is not defined in the 1978 Rules. The district court reasoned that the failure to define the term indicated an intent not to change the method of calculating retention points. We agree that there was no intent to change the method of calculation. Because we have found the earlier rules consonant with the interpretation of the RIF guideline, we find further support for our conclusion as to the meaning of the 1978 rules.
 
 
 25
 The meaning of the term "original appointment" is not self-evident; it could refer either to the time an employee started to work in a particular agency or to the time an employee was first employed in any Merit System agency. In the earlier 1975 Rules the term is defined as "the first appointment of an individual to a position," which is equally ambiguous. The 1971 Rules did distinguish the discretionary probationary period for promoted employees from the mandatory period required "for original appointments for the new position," (Art. IX, Sec. 1, p (2)) thereby suggesting "original appointment" referred to first employment in the Merit System. However, in the controlling 1978 Rules, while the mandatory and discretionary periods are retained, the explicit reference to "original appointments" is dropped, thereby substantially weakening the force of this suggestion. Rule 10(5).
 
 
 26
 Further, retention points are calculated in the Merit System on the basis of both length of service and performance evaluation. The employee's performance evaluation is retained in the employee's personnel file in the agency. Rule 14(4). Rule 18(1)(d) does not list performance evaluations among the items the Nebraska Merit System is required to keep, while Rule 18(2)(b) indicates that an agency personnel file of an employee is not available to representatives from a different agency. It seems likely that if performance evaluations from other agencies were to be used in calculating retention points, the rules would have established access to an employee's personnel files.
 
 
 27
 While the Merit System rules do not provide a model for clarity and do admit of some ambiguity, we believe a careful reading of the contested portions with care for the context in which they appear indicates that the state officers were correct in limiting the calculations of retention points to CETA employment. Accordingly, the regulations create no additional property interests upon which the employees can base a constitutional claim.
 
 II.
 A.
 
 28
 The district court found that all employees had been deprived without due process of law of property interests in continued employment with the Department of Labor. It found such property interests stemming from denial of retention points for all four employees and from denial of bumping rights for Gettemy and Polk.
 
 
 29
 The procedures that are to be followed by agencies when an RIF occurs are established by Merit System rules 12(1)(c) and 13. Employees must be notified of the RIF formula so that all employees have access to it. Rule 12(1)(c)(iv). Each affected employee is to be given at least fourteen days notice of layoff unless budgetary constraints require otherwise. Rule 12(1)(c)(ii). An employee may then appeal to the Merit Council pursuant to Rule 12(1)(c)(viii). An appeal is provided to the Council from any agency determination that a person was not entitled to bump to a specific position. Rule 13.
 
 
 30
 The appeal procedure before the Merit Council is established by Rule 13. Rule 13(9) states:
 
 
 31
 A permanent classified employee who is dismissed, suspended or demoted may appeal in writing to the Council within fourteen (14) calendar days of the effective date of the dismissal, suspension or demotion. Within seven (7) calendar days of the receipt of such written appeal, the Director shall provide the employee and the Appointing Authority with written notice of the hearing date. The hearing date shall be within thirty (30) calendar days following notice by the Director and subject to change upon mutual agreement of all parties concerned. The Council shall make its recommendations in writing to the Appointing Authority within fifteen (15) calendar days of the hearing date. After consideration of the Council's recommendations, the Appointing Authority shall make a decision which shall be recorded in the permanent records of the Agency. The Appointing Authority or designated representative shall promptly give written notice to the employee and the Merit System Office of the Appointing Authority's final decision.
 
 
 32
 In addition to such appeal, employees may seek a binding declaratory ruling pursuant to Rule 20(4). A request for such a ruling must be answered within fifteen working days unless it requires a response from the Council, in which case there is to be an answer within fifteen working days following the Council's next meeting. Further, under Neb.Rev.Stat. Sec. 84-911 (1981), employees are entitled to obtain a declaratory judgment from the appropriate state district court without first pursuing the administrative relief. Under the Nebraska Administrative Procedures Act, the decision of the Commissioner of Labor is appealable to the state district court.
 
 
 33
 Given these procedures, we are faced with the question whether due process is violated, first, as the employees urge on appeal, by the failure to provide a pretermination hearing and, second, as the district court found, by the advisory role of the Merit Council in the appeal process.
 
 
 34
 In Parratt v. Taylor, the Supreme Court stated:
 
 
 35
 Our past cases mandate that some kind of hearing is required at some time before a State finally deprives a person of his property interests. The fundamental requirement of due process is the opportunity to be heard and it is an "opportunity which must be granted at a meaningful time and in a meaningful manner." * * * However, * * * we have rejected the proposition that "at a meaningful time and in a meaningful manner" always requires the State to provide a hearing prior to the initial deprivation of property. This rejection is based in part on the impracticability in some cases of providing any preseizure hearing under a state-authorized procedure, and the assumption that at some time a full and meaningful hearing will be available.
 
 
 36
 451 U.S. 527, 540, 101 S.Ct. 1908, 1915-1916, 68 L.Ed.2d 420 (1981).
 
 
 37
 On the facts of the instant case, we believe that to require hearings before the implementation of an RIF guideline would involve such impracticability. The establishment of the RIF guideline involved an interpretation of Merit System rules by state officers faced with funding shortfalls. To require a hearing on the possibility that such an interpretation might be incorrect would considerably burden governmental decision-making. See Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976) (the government's interest, including the fiscal and administrative burden involved, is to be considered in evaluating whether procedural due process is met).
 
 
 38
 In addition, in Arnett v. Kennedy, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974), a case involving discharge of a federal employee under the Lloyd-La Follette Act, six members of the Court held that due process was not violated by the lack of a pretermination hearing, given the discharge procedures established by the Act. We believe that the similar discharge procedures outlined above that were available to the employees after the implementation of the RIF guideline provided such protection of their rights that the absence of a pretermination hearing alone was not violative of due process.
 
 
 39
 The district court found due process was violated in that the appeal to the Merit Council described above involves only a recommendation by the Council with the appointing authority remaining "the ultimate judge of the propriety of its decision." It found that the lack of a "neutral arbiter" made the appeal process under Rule 13(9) an inadequate substitute for a pretermination hearing. A challenge involving a similar situation was mounted in Nevels v. Hanlon, 656 F.2d 372 (8th Cir.1981). Nevels argued that because the Merit System rules of Nebraska require the Commissioner of Labor to make the initial determination to dismiss an employee and then to make the final decision on any appeal, the Commissioner is predisposed to uphold his original decision and is not, therefore, an impartial decisionmaker. We firmly rejected that argument. In Withrow v. Larkin, 421 U.S. 35, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975), a procedure in which an administrative board both investigated and adjudicated a case was found not to violate due process. In Nevels, although the Commissioner technically initiated Nevels' discharge, in actuality it had been initiated by his immediate supervisors. We found that having the Commissioner review the actions of his subordinate ran far less risk of actual bias or prejudgment than the practice approved in Withrow. In the instant case, the initial involvement of the appointing authority consisted of approval of the RIF guideline, including its general statements regarding bumping rights. No initial decision was made as to the rights of Gettemy and Polk to bump to particular positions. In this situation we cannot say that the procedure involved "necessarily creates an unconstitutional risk of bias in administrative adjudication" or that the employees have "overcome a presumption of honesty and integrity in those serving as adjudicators." Withrow, 421 U.S. at 47, 95 S.Ct. at 1464. Therefore, we conclude that the Merit System appeal process vesting the final decision in the appointing authority is not violative of due process without a further showing of bias or prejudgment. Since no further showing was made, the employees' due process claim must be rejected.
 
 B.
 
 40
 The district court also found that the denial of retention points to all employees and the denial of bumping rights to Gettemy and Polk were impermissible impairments of contracts in violation of the United States Constitution.
 
 
 41
 Article I, section 10 of the United States Constitution provides: "No State shall * * * pass any * * * Law impairing the Obligation of Contracts." In New Orleans Waterworks Co. v. Louisiana Sugar Refining Co., the Supreme Court stated:
 
 
 42
 In order to come within the provision of the Constitution of the United States which declares that no State shall pass any law impairing the obligation of contracts, not only must the obligation of a contract have been impaired, but it must have been impaired by a law of the State. The prohibition is aimed at the legislative power of the State, and not at the decisions of its courts, or the acts of administrative or executive boards or officers, or the doings of corporations or individuals.
 
 
 43
 125 U.S. 18, 30, 8 S.Ct. 741, 747, 31 L.Ed. 607 (1888) (emphasis added). Recent United States Supreme Court cases interpreting the contract clause have not dispensed with the necessity of establishing that the contract at issue was impaired by an act of legislative power. See Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978); United States Trust Co. v. New Jersey, 431 U.S. 1, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977). Contra Halpin v. Nebraska State Patrolmen's Retirement System, 211 Neb. 892, 320 N.W.2d 910 (1982). The drawing-up of the RIF guideline and the determination of Gettemy and Polk's bumping rights by state officials were administrative acts. The acts did not change the Merit System rules; rather, they applied them to particular cases. Thus, there was no attempt on the part of the state and its officials "to use the law * * * to repudiate a contractual obligation, Jackson Sawmill Co. v. United States, 580 F.2d 302, 312 (8th Cir.1978) cert. denied, 439 U.S. 1070, 99 S.Ct. 839, 59 L.Ed.2d 35 (1979), since the contested obligation stemmed from the very law in question. As in Jackson, the employees "have confused impairment of performance of a contract with impairment of the obligation of the contract. The Constitution does not provide a federal action for simple breach of contract." Id. Given this holding, we need not reach the issue of whether a claim under article I, section 10 is actionable under 42 U.S.C. Sec. 1983. We conclude the state did not violate the contract clause in its drafting of the RIF guideline and its determination of Gettemy and Polk's bumping rights.[3]
 
 III.
 
 44
 The district court also granted James Baudler relief on the finding that his inclusion in the layoff was affected by his political affiliation.
 
 
 45
 At the outset, we believe there is a serious question as to the sufficiency of the evidence to support the finding. The district court primarily based its finding on two conversations, one between Baudler and William Loder, CETA Director, on July 1, 1981, the other between Baudler and Daniel York, Deputy Director, on September 2, 1981. Baudler testified that at the July 1 meeting Loder told him that if he were a Republican he would be one of the top persons in the organization. Loder testified that this was his way of telling Baudler he had excellent capabilities in the technical area and that such capabilities could have led to his selection as Deputy Director. Since positions above Baudler's were filled by the patronage system, we see no impropriety in Loder's remark. Baudler also testified that Loder told him he should consult a professional resume writer and that the comments were made in regard to the stress, tension, and pressures that Baudler apparently was experiencing on the job. The comments were made during a performance evaluation in which below satisfactory marks in "communication" relating to a lack of dependability and cooperation were discussed and do not appear to us to bear on Baudler's political affiliation.
 
 
 46
 Baudler also offered into evidence a diary entry indicating that on September 2, 1981 Daniel York told him that purely partisan decisions were being made regarding the reduction in force. At trial, York denied making the statement and testified that at the time he had no precise idea whom the affected individuals would be. We believe that the probative value of the diary entry, uncorroborated as it is, and filtered through the perceptions of an employee experiencing job difficulties, is weak.
 
 
 47
 The district court also found that an incident in which Commissioner John Hanlon bought a group of employees drinks and then, according to Baudler, upon being thanked by Baudler, told him, "I hope you choke on it," added credence to Baudler's claim. Hanlon did not remember making the remark. Robert Shanahan, an employee in the group who was sitting near Hanlon and Baudler, did not remember hearing Hanlon make the remark. If the remark was made, we see no indication that it was made because of Baudler's political affiliation.
 
 
 48
 We believe the district court properly found that the other testimony Baudler offered in support of his claim, such as a statement by Loder to Baudler that a certain way of running a program was a "democratic way of doing things," a denial of a telephone credit card when the number of cards issued in the CETA Division was cut from seventy-five to five and an incident in which Commissioner Hanlon questioned Baudler's use of sick leave after Baudler had taken sick leave for a day but was then met by Hanlon in a public building, did not indicate political prejudice against Baudler.
 
 
 49
 The findings of fact of a trial court are not to be set aside unless they are clearly erroneous, and due regard is to be given to the opportunity of the trial court to judge the credibility of the witnesses. Fed.R.Civ.P. 52(a); see Pullman-Standard v. Swint, 456 U.S. 273, 284 n. 14, 102 S.Ct. 1781, 1788 n. 14, 72 L.Ed.2d 66 (1982); Hoefelman v. Conservation Commission of the Missouri Department of Conservation, 718 F.2d 281 (8th Cir.1983). A court of appeals can declare a finding of fact clearly erroneous only if there is no substantial evidence to support it or if, upon considering the entire record, it is left with the definite and firm conviction a mistake as been made. Id. at 285. We believe that under this test the district court's finding might very well be judged clearly erroneous. We need not decide this issue or base our decision solely on it, however, since other considerations necessitate a reversal of the relief granted Baudler.
 
 
 50
 The district court found that Baudler could not successfully make a claim under the first amendment because Elrod v. Burns, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976), exempts those in policymaking positions from protection under the first amendment for dismissal due to political affiliation. This determination was not appealed by Baudler. However, the district court found that Baudler had rights entitled to due process protection under the Merit System rules. Rule 1(2)(e) of the 1978 Merit System rules states that one of the principles of the system is to assure "fair treatment of applicants and employees in all aspects of personnel administration without regard to political affiliation." With such rights involved, the issue is then whether Merit System procedures provided adequate protection. Rule 13(6) establishes the appeals process when such rights are involved:
 
 
 51
 Any applicant or employee who has reason to believe that he/she has been discriminated against because of religion, political opinions, or affiliations, race, sex, national origin, age, disability, or any other nonmerit factor in any personnel action including denial of transfer, may appeal to the Council. Such appeal shall be filed in writing and within ninety (90) calendar days of the alleged discrimination. The Council, or its designated representative, shall hear the appeal and give its written decision within thirty (30) calendar days. The Council decision shall be final and binding in all cases of alleged discrimination (emphasis added).
 
 
 52
 Since the Council's decision is binding in such instances, the issues regarding the advisory role of the Council and the lack of a "neutral arbiter" do not arise. We believe that the general appeal procedures of the Merit System we discussed above read in conjunction with Rule 13 establish that adequate due process was afforded Baudler on his political affiliation discrimination claim.
 
 
 53
 The district court also held that political discrimination against Baudler constituted an impermissible impairment of contract. The conclusion must be rejected for the reasons we have discussed above.
 
 IV.
 
 54
 The state and its officials also argue that the State of Nebraska, the Department of Labor, and the Joint Merit System were immune from suit under the eleventh amendment. Given our conclusions above, we need not reach this issue.
 
 
 55
 This case underscores the statement in Bishop v. Wood, 426 U.S. 341, 349, 96 S.Ct. 2074, 2080, 48 L.Ed.2d 684 (1976): "The federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies." We reverse the district court's declaration that retention points for the employees were to be calculated to reflect their total length of service with the Department of Labor, its conclusions that the employees' due process and impairment of contract rights were violated, and its issuance of injunctive relief to prevent any reduction in Baudler's salary because of his political affiliation. The district court's findings that Gettemy was entitled to be considered to have held the Operations Manager position, Polk a Personnel Officer II position, and Baudler a Planning Specialist position were not specifically raised on appeal. Nonetheless, since they were relief for claims we have found not to be cognizable under section 1983, they also must be reversed.
 
 
 56
 We reverse the judgment of the district court.
 
 
 
 [1]
 To "bump" is to fill a position with an employee with greater seniority at the expense of one with less seniority, so that the senior employee may avoid layoff. A "class" is defined by the Merit System rules as one or more positions functionally similar so as to require the same minimum qualifications of training and experience
 
 
 [2]
 It is true that in Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), the Court stated that a "legitimate claim of entitlement to continued employment" might be justified by "the existence of rules and understandings, promulgated and fostered by state employees." Id. at 602, 92 S.Ct. at 2700. Such unwritten understandings, however, were viewed as supplementing explicit contractual provisions in the absence of other explicit provisions. Id. Since the Merit System rules expressly state terms of employment, no room is left in the instant case for implied contractual agreements. Further, the district court made it clear in its opinion that it was relying on the rules but looking to the statements of various supervisors to bolster its interpretation. That the employees may reasonably have thought that their superiors had authority to give assurances of transferred seniority rights does not affect our conclusion that the Merit System rules alone govern. It is well established that anyone who deals with the government assumes the risk that the agent acting in the government's behalf has exceeded the bounds of his authority. See, e.g., Federal Crop Insurance Corp. v. Merrill, 332 U.S. 380, 384, 68 S.Ct. 1, 3, 92 L.Ed. 10 (1947); Bollow, 650 F.2d at 1100; Lavin v. Marsh, 644 F.2d 1378, 1383 (9th Cir.1981); Gray v. Johnson, 395 F.2d 533, 537 (10th Cir.), cert. denied, 392 U.S. 906, 88 S.Ct. 2056, 20 L.Ed.2d 1364 (1968)
 
 
 [3]
 The employees also argue on appeal that implementation of the RIF guideline would deprive them of their property without just compensation in violation of their fifth amendment rights. As this issue was not raised at the district court level, we need not consider it. Singleton v. Wulff, 428 U.S. 106, 120-21, 96 S.Ct. 2868, 2877-2878, 49 L.Ed.2d 826 (1976); Ludwig v. Marion Laboratories, 465 F.2d 114 (8th Cir.1972)