James H. PRAPROTNIK, Appellee,

v.

CITY OF ST. LOUIS, a municipal corporation, Appellant.

Frank Hamsher; Charles Kindleberger, Community Development Agency; and Deborah Patterson, Community Development Agency.

Nos. 85–1145, 85–1267 and 85–1268.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1986.

Decided Aug. 19, 1986.

Robert H. Dierker, Jr., St. Louis, Mo., for appellant.

Charles R. Oldham, St. Louis, Mo., for appellee.

Before LAY, Chief Judge, BRIGHT, Senior Circuit Judge, and ROSS, Circuit Judge.

LAY, Chief Judge.

The City of St. Louis (City) appeals from a jury verdict finding the City liable under 42 U.S.C. § 1983 for depriving James Praprotnik, a laid-off City employee, of his constitutional rights. The jury found (1) that Praprotnik had been penalized for exercising his first amendment rights, and (2) that his lay off had been motivated by improper reasons, depriving him of due process of law. We face a complicated appeal brought by the City made difficult by confusing, bifurcated instructions requested by both parties, the use of two special verdicts for the same damages, and rather conclusory arguments made by both sides on appeal. We affirm in part, reverse in part, and remand for reconsideration of the amount awarded in attorney fees.

Praprotnik was a City employee from 1968 until he was laid off on December 30, 1983. In 1980, Praprotnik held a management position in the Community Development Agency (CDA) as an architect when he became embroiled in a dispute with his superiors. Charles Kindleberger, Praprotnik's immediate supervisor, suspended Praprotnik for fifteen days as a result of this dispute. Praprotnik appealed his suspension to the City civil service commission pursuant to civil service rules. Praprotnik's co-workers testified at trial that Praprotnik's job responsibilities were reduced and his work transferred to other employees with less experience during this period. One employee testified that there was a change in management attitude toward Praprotnik from the time he appealed his

suspension. The commission determined that Praprotnik's suspension was unreasonable and excessive, and Praprotnik was reinstated with back pay.

Approximately two weeks before Praprotnik was suspended, and several days before the dispute arose, Kindleberger recommended Praprotnik for a two-grade, "super step" increase, based on Praprotnik's superior performance. In October 1980, after the dispute, Praprotnik was reviewed again. This time, Kindleberger rated Praprotnik "good" overall, but recommended a two-step *decrease* in salary grade. When Praprotnik asked Kindleberger the reasons for the salary decrease, Kindleberger said that Donald Spaid, Kindleberger's own supervisor and the department director, believed that Praprotnik had not been fully honest in the course of the hearings before the commission and that Spaid was "down on" Praprotnik. Upon Praprotnik's appeal of the two-step decrease, he was awarded a one-step increase, overturning Kindleberger's recommendation.

When Praprotnik's annual review was again performed in October 1981, he was rated "adequate" in several categories and "inadequate" in "relationships." Prior to Praprotnik's suspension appeal, Praprotnik had never received a rating lower than "good." A confidential memorandum from one of Praprotnik's raters, Al Karetski, to Kindleberger recited the factors contributing to the "inadequate" rating for "relationships:"

> Relationships which Jim [Praprotnik] had with other employees, subordinates and superiors presented difficulties. For example, he did not relate well to the previous Director of the Agency [Spaid], who expressed that he should be fired, that he [Praprotnik] was "sabotaging" the department and that he could not be trusted.

Praprotnik again appealed the rating, resulting in a ruling that Praprotnik's "inadequate" rating for "relationships" be raised to an "adequate" rating.

In the spring of 1982, major staff and budget reductions were made in Praprotnik's agency. At that time, Praprotnik had seniority over two other employees in the agency in his job classification. At the same time, the City's Heritage and Urban Design Division (H. & U.D.), headed by Henry Jackson, had commenced a search to fill a position of far lesser responsibility and salary than Praprotnik's job. The new director of the CDA, defendant Frank Hamsher, proposed that some of Praprotnik's duties be transferred and consolidated with the vacant position at H. & U.D. to create a position classified at a grade equivalent to Praprotnik's. Henry Jackson, as well as Jackson's superior, Thomas Nash, agreed to the consolidation of functions.

Praprotnik was then informed that he would be transferred to H. & U.D. Hamsher told Praprotnik that this was to be a lateral transfer of personnel and job functions. Praprotnik objected to the transfer and attempted to appeal the decision. The civil service commission declined to hear the appeal, however, on the ground that Praprotnik had lost nothing by the transfer, even though Praprotnik thereby forfeited his seniority for lay-off purposes since he became the only employee in his job classification at H. & U.D.

Praprotnik soon became very unhappy in his new job at H. & U.D. Although his architectural duties had purportedly transferred with him, Jackson apparently took those duties over himself, and left Praprotnik to perform clerical functions. In November 1982, Praprotnik was given his first service rating in the new job. Jackson rated him "inadequate" overall, and indicated that Praprotnik was no longer in a management position, that he was "grossly overqualified," and that his position should be reclassified. Jackson also recommended that Praprotnik's salary be decreased by one step.

Praprotnik again appealed his rating to the service rating appeal board. The appeal board raised each of Jackson's "inadequate" ratings to "adequate", and reversed the pay reduction recommendation. In the meantime, however, Praprotnik's position

was reclassified to a lower grade, and Jackson's replacement, Robert Killen, admitted that by July 1983, plans were being made to lay Praprotnik off.

These plans came to fruition on December 23, 1983, when Praprotnik received notice that he would be laid off effective December 30, 1983. The timing of the lay off imposed an unusually heavy burden on Praprotnik personally. Not only was it the holiday season, but Praprotnik had just the day before been released from the hospital following surgery. The lay off meant that he lost his income, as well as over 500 hours of accumulated sick leave and all other pension and vacation benefits, and that his medical insurance was cancelled. The reason given for his lay off was lack of funds.

Thomas Nash, the director of public safety and in charge of H. & U.D., further testified at trial as to the reason for Praprotnik's lay off. Nash stated that the work load at H. & U.D. was too heavy for the existing number of staff and that he could pay two lower level people out of Praprotnik's salary. Nash also stated that Praprotnik was laid off because of his performance. He did not consider downgrading Praprotnik as a possible budgetary solution.

Nash also explained the bureaucratic procedure involved in effecting the lay off. The recommendation for the lay off had to come from Nash initially. The mayor's office would have also been informed, but Nash characterized Praprotnik's lay off as a "minor reorganization" not requiring direct discussion with the mayor's office.

William Duffe, the director of personnel, further explained the lay-off process. According to Duffe, lay offs are "made when the appointing authority determines there is a lack of work or a lack of funds within his agency." A department head desiring a reduction in force by lay off would first communicate the need to the personnel director. The personnel director would then provide a lay-off list to the department head, indicating which employees were subject to lay off and in what order.

Praprotnik appealed his lay off to the civil service commission. Under the City charter, employees may be laid off only for lack of work or lack of funds, and reorganization by itself is not a proper basis for lay off. Praprotnik's appeal of his lay off to the civil service commission is still pending, however, apparently because Praprotnik filed this lawsuit before his lay off occurred and the civil service commission has stayed its proceedings until a final decision on the entire matter is rendered by the courts.[1]

Praprotnik's suit alleged that his transfer and lay off were improperly motivated by certain City supervisors [2] (1) in violation of his first amendment right to pursue his grievance from the suspension and (2) in violation of his due process rights. The jury returned two forms of special verdict finding the City liable under both theories and assessing damages for $15,000 for the first amendment violation and another $15,000 for the due process violation. In each instance, however, the jury exonerated the individual defendants.[3] The City appeals.[4]

---

**1.** Praprotnik originally brought this suit on February 8, 1983, after his transfer, when the civil service commission dismissed his appeal on that matter. In his original complaint, Praprotnik named the City, Charles Kindleberger, Frank Hamsher, Deborah Patterson, and Henry Jackson as defendants, and alleged that each personnel action taken against him was unconstitutional. After his lay off, he amended his complaint to include the lay off as an additional constitutional violation and deleted Henry Jackson as a defendant, presumably because Jackson had left city employment and had moved outside the jurisdiction.

**2.** Specifically, he named Frank Hamsher and Charles Kindleberger, his supervisors in the

CDA at the time of his transfer, and Deborah Patterson, the head of the CDA at the time of his lay off, as individual defendants.

**3.** A preliminary issue is raised by the City as to whether the per curiam decision in *City of Los Angeles v. Heller,* —— U.S. ——, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), precludes Praprotnik's recovery against the City by reason of the jury's finding the individual defendants not liable. In *Heller,* a similar issue arose in an action involving an allegedly unlawful arrest made by a Los

**4.** See note 4 on page 1173.

We affirm the verdict based on the City's retaliatory conduct against Praprotnik; we vacate the verdict based on the due process claim.

**Identity of municipal policymakers effecting Praprotnik's transfer and lay off**

■ The City's principal challenge to the verdict raises the propriety of the jury's implicit finding that Praprotnik's injury was brought about by an unconstitutional city policy, a requisite for municipal liability under *Monell v. New York City Dept. of*

Angeles police officer. The plaintiff sued both the individual officer and the city, but a bifurcated trial was held in which the claim against the individual officer was considered first. The jury returned a verdict for the police officer, although no good faith defense instruction had been submitted. The district court then dismissed the claim against the city. The Supreme Court agreed that this was the proper course because "the jury [had] concluded that the officer inflicted no constitutional harm." *Heller*, 106 S.Ct. at 1573.

*Heller* is, however, distinguishable from the present case. Crucial to the result in *Heller* was the fact that the city's liability, if any, was solely derivative of the conduct of the named individual defendant. *Id.* Here, persons other than the named defendants, namely, Thomas Nash and Robert Killen, effected city policy in laying Praprotnik off and thereby brought to fruition Praprotnik's ultimate injury. The failure of the jury to find the individual named defendants responsible for Praprotnik's damages can be justified by the fact that the named defendants were not the supervisors directly causing the lay off, when the actual damages arose. Under one of the court's instructions, the jury was told to find the named individuals liable only if they were personally involved in the lay off. It was error to give this instruction because there was no evidence to show that the named defendants were ever involved in the actual decision to lay Praprotnik off. Under this erroneous instruction, though, it is easily understood why the jury returned verdicts for the named defendants and yet found the City liable.

We also note that the court in another instruction states that the named defendants must have been involved in the transfer "and/or" the lay off. The phrase "and/or" has been dubbed an "ugly device," H.W. Fowler, A Dictionary of Modern English Usage *29* (E. Gowers 2d ed. 1983), said to "destroy[ ] the flow and goodness of a sentence" and "[u]seful only to those who need to write diagrammatically or enjoy writing in riddles." W. Strunk & E.B. White, The Elements of Style 34 (1959). The term "kills the plain sense of [ ] words formerly deemed adequate by the layman," W. Follett, Modern Eng-

*Social Services*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978). *See also Pembaur v. City of Cincinnati,* — U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986); *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). We adopt the analysis made in this court's decision in *Williams v. Butler,* 746 F.2d 431 (8th Cir.1984) (reheard en banc, May 14, 1986, 762 F.2d 73 (8th Cir.)) in determining whether Praprotnik's lay off and transfer were acts of city policy. *Williams* recites that:

lish Usage 64 (J. Barzun ed. 1966). and is commemorated in the couplet:

Had he foreseen the modern use ˉof *and/or*
It would have sickened Walter Savage Landor.
*Id.* at 65.

The City further argues that Praprotnik failed to argue Nash's and Killen's role in the lay off to the jury, and therefore may not rely on this theory on appeal. We find that this theory was raised at trial. Evidence was offered to support Praprotnik's closing argument that:

Who made the decisions about the layoff?
One was Mr. Nash, who is the director of department of public safety. He's in the mayor's cabinet. He speaks—he's a high government official.
Who else made that decision? A Mr. Killen who is the commissioner of Heritage and Urban Design. He's a high government official.

4. The City argues for the first time on appeal that we should abstain from exercising jurisdiction over this matter on *Pullman* principles. *See Railroad Commission v. Pullman Co.,* 312 U.S. 496, 500–01, 61 S.Ct. 643, 645–46, 85 L.Ed. 971 (1941). The *Pullman* abstention doctrine counsels federal courts to defer deciding matters "when difficult and unsettled questions of state law must be resolved before a substantial federal constitutional question can be decided." *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229, 104 S.Ct. 2321, 2327, 81 L.Ed.2d 186 (1984). However, "[w]here there is no ambiguity in the state statute, the federal court should not abstain but should proceed to decide the federal constitutional claim." *Wisconsin v. Constantineau,* 400 U.S. 433, 439, 91 S.Ct. 507, 511, 27 L.Ed.2d 515 (1971). In this case, there is no uncertain question of state law. The fact that Praprotnik's claim for reinstatement is still pending before the civil service commission is of no concern here. Praprotnik is not required to exhaust his administrative remedies before pursuing his civil rights claim. *Patsy v. Florida Board of Regents,* 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982); *see also Simpson v. Weeks,* 570 F.2d 240, 241 (8th Cir. 1978).

(1) if, according to a policy or custom established by a governing body, an official is delegated the authority, either directly or indirectly, to act on behalf of a governing body; and (2) if a decision made within the scope of the official's authority ends the matter, then the acts of the official may fairly be said to be those of the local governing body.

*Williams*, 746 F.2d at 438.[5]

■ Applying the first prong of this test, we must consider whether and which city officials were delegated authority to act on behalf of the city in effecting Praprotnik's transfer and lay off. Under the city charter and civil service rules, an "appointing authority"[6] may initiate a lateral transfer or a lay off subject only to the approval of the director of personnel. Under the city civil service rules:

> Transfer of a classified employee from a position under the jurisdiction of one appointing authority to a position under the jurisdiction of another appointing authority may be made with the approval of the Director and the appointing authorities' consent, provided the positions are in the same class or a similar class requiring no additional or different tests of fitness and having the same maximum rate of pay.

Lay offs are also initiated by the relevant "appointing authority." The rules state:

> Whenever there shall be no further need for employment in any position because of either a stoppage of work or lack of available funds or for any other reason, such position may be abolished and regular employees in the classified service may be laid off without pay, despite any provision of the rules concerning tenure.

Again, a supervisory "appointing authority" initiates the action by giving notice to the personnel director and the employee. Thomas Duffe, the city's personnel director, testified that his approval of these actions is conditioned on formal compliance with the rules only; he does not assess their substantive propriety. In this case, there is no dispute that each of the challenged employment decisions were procedurally "by the book"; therefore, under the first prong of the test recited in *Williams*, a jury could reasonably find that Praprotnik's supervisors, his "appointing authorities," were acting on behalf of the city in taking these actions.

■ The City disagrees, arguing that the City review procedures available to an employee aggrieved by a personnel decision shifts the mantle of City responsibility from the shoulders of Praprotnik's supervisors to the civil service commission, the body charged with hearing appeals from adverse decisions. As the second prong of our test holds, for a city employee to be a "policymaker" his or her decision must "end[ ] the matter," *Williams*, 746 F.2d at 438, and there must be "no internal procedure of redress for the victim," *id.* The City argues that where as here, Praprotnik could pursue an appeal of his supervisors' decisions, they cannot be deemed final authorities acting on behalf of the City with respect to those decisions.

The existence of an appeal process does not automatically divest a decisionmaker of final authority for purposes of attributing municipal liability, however. In *Bowen v. Watkins*, 669 F.2d 979 (5th Cir.1982), the question presented was whether a city police chief exercised final authority over promotion decisions even though his decisions were reviewable by the city council. The court stated:

> When an official has final authority in a matter involving the selection of goals or of means of achieving goals, his choices represent governmental policy. If a higher official has the power to overrule a decision but as a practical matter never does so, the decision-maker may represent the effective final authority on the

---

5. This approach is viewed with approval in *Pembaur v. City of Cincinnati,* — U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

6. An "appointing authority" is defined in the rules as "any person or group of persons having power by law or ordinance, or by lawfully delegated authority, to make appointments to any position in the City Service."

question. Finally, *even if there is an appeal of an action but the appellate body defers in substantial part to the judgment of the original decision-maker*, the original decision may be viewed as the government's policy.

*Bowen*, 669 F.2d at 989–90 (Wisdom, J.) (citations omitted) (emphasis added); *see also Wilson v. Taylor*, 733 F.2d 1539, 1546–47 (11th Cir.1984); *Berdin v. Duggan*, 701 F.2d 909, 914 (11th Cir.), *cert. denied*, 464 U.S. 893, 104 S.Ct. 239, 78 L.Ed.2d 230 (1983). Like Praprotnik, the employee in *Wilson* had recourse to a civil service board, as well as to a city commission, yet the court held that the jury could nevertheless reasonably have found that a police chief had exercised final authority over a decision to terminate. *Wilson*, 733 F.2d at 1546–47.

There is little doubt that the decision to transfer Praprotnik was controlled by his supervisors and not by the civil service commission on appeal. Although the civil services rules do provide an avenue of appeal for non-disciplinary matters such as transfers, the commission refused to hear Praprotnik's appeal on the ground that he had lost nothing by the transfer. This disposition suggests that lateral transfers are insulated from attack on appeal because they are deemed not adverse to the employee.

■ The scope of redress available for the lay off presents a similar picture. The employee may appeal a lay off to the civil service commission, but according to the personnel director the appeal is decided solely on the basis of written submissions. Such a procedure is indicative of a highly circumscribed scope of review, especially because questions of credibility may enter into the determination of whether a lay off was motivated for proper reasons. Since the commission thereby appears to "defer[ ] in substantial part to the judgment of the original decisionmaker," *Bowen*, 669 F.2d at 989–90, final authority for a lay off may fairly be said to rest with the initiating supervisor. The jury thus had sufficient evidence from which to conclude

that the City may be subject to liability for the supervisor's acts.

**First Amendment**

Praprotnik urges that both the transfer and the lay off were taken in retaliation for Praprotnik's exercise of his right to appeal his suspension. He argues that he was thereby penalized for exercise of protected activity under the first amendment. This court has distilled a three step analytical framework to be applied in considering such a claim:

> (1) whether the plaintiff has carried the burden of demonstrating that he [or she] engaged in protected activity; (2) whether the protected activity was a substantial or motivating factor in the actions taken against the plaintiff; and (3) whether the defendant has defeated the plaintiff's claim by demonstrating that the same action would have been taken in the absence of the protected activity.

*Bowman v. Pulaski County Special School Dist.*, 723 F.2d 640, 643–44 (8th Cir.1983) (citations omitted); *see also Barnes v. Bosley*, 745 F.2d 501, 507 (8th Cir.1984). In this case, only the second and third levels of analysis are in issue. The first question, whether Praprotnik's pursuit of his initial appeal constituted protected activity, has never been challenged by the City.

■ We must first address, then, whether Praprotnik made the showing that his transfer and lay off were substantially motivated by retaliation for his appeal. This determination is a question of fact for the jury, *see Greminger v. Seaborne*, 584 F.2d 275, 278 (8th Cir.1978), and this court must thus defer to the jury's finding in the affirmative on this question unless the finding is without substantial evidence to support it. As evidence of the City's motive, Praprotnik relies primarily on the specific sequence of events leading to his transfer and lay off. He points to the consistent decline in his duties and responsibilities from the time he appealed his suspension until he was laid off three years later. In light of Praprotnik's overall employment

history, his suspension appeal does represent a watershed point. Until that time, Praprotnik was rated an excellent employee and was consistently promoted and upgraded within his job classification. The relevance of evidence of superior performance prior to the exercise of protected activity to the question of motive has often been assumed. *See, e.g., McGee v. South Pemiscot School Dist. R–V,* 712 F.2d 339, 344 (8th Cir.1983); *Greminger,* 584 F.2d at 278 n. 3. Moreover, this court has recognized the potential depth of a supervisor's reaction to employee complaints:

> We do not underestimate the internal unease or unpleasantness that may follow when a government employee decides to break rank and complain either publicly or to supervisors about a situation which s/he believes merits review and reform. That is the price the First Amendment exacts in return for an informed citizenry.

*Bowman,* 723 F.2d at 646 (quoting *Monsanto v. Quinn,* 674 F.2d 990, 1001 (3d Cir.1982)).

In addition, Praprotnik put forth evidence that his exercise of his appeal right continued to influence his supervisors at CDA at least until October of 1981. At that time, one of his performance raters, Al Karetski, relied on Donald Spaid's adverse comments about Praprotnik, comments apparently motivated by Praprotnik's appeal, to justify an "inadequate" rating in the "relationships" category.[7] Six months later, Praprotnik's transfer was orchestrated by Frank Hamsher, Karetski's boss. Although there is nothing in the record directly suggesting that Hamsher ever saw Karetski's memorandum, Praprotnik did appeal the rating based on the memorandum and it would be reasonable to infer that Hamsher would have reviewed the documents supporting the rating in considering Praprotnik's appeal. Under this view of the facts, a rational jury could reason-

ably conclude that Praprotnik's transfer was substantially motivated by his exercise of his appeal rights.

■ A closer question concerns the causal relationship between the improperly motivated transfer and Praprotnik's lay off. General principles of causation in tort law are applicable to constitutional torts litigated under § 1983. See *Parrett v. City of Connersville, Ind.,* 737 F.2d 690, 695 (7th Cir.1984); *cf. Martinez v. California,* 444 U.S. 277, 281, 285, 100 S.Ct. 553, 557, 559, 62 L.Ed.2d 481 (1980). In *Parrett,* city officials were found to have caused a city employee's constructive discharge following the employee's transfer from a responsible position as a police department detective to a "make work" job. The *Parrett* court eloquently describes the connection between an employee being transferred into such a job and the employee's ultimate decision to leave the job entirely:

> [A]s a former chief of detectives, still young, Parrett was not a drudge or a time-server but an ambitious professional. Enforced idleness was not only a humiliating counterpoint to his years as detective chief but would if prolonged have depreciated his professional skills to the point where it would have been difficult for him to work his way back * * * to a responsible position. For anyone with some self-respect the position that [the defendant] placed Parrett in was intolerable; even if his health had not collapsed under the strain, he would have had to quit. The responsibility for his leaving was thus the defendants'.

*Parrett,* 737 F.2d at 694. Praprotnik's situation after his transfer was no different; like the employee in *Parrett,* it was only a matter of time until Praprotnik would have been forced to leave his position. That Praprotnik was laid off instead does not shift responsibility away from the actions of his CDA supervisors[8] for causing his severance from City employment.

7. Spaid was the director of the CDA at the time Praprotnik took his initial appeal; Spaid had told other supervisors that Praprotnik should be fired and that Praprotnik was sabotaging the department and could not be trusted.

8. The damages Praprotnik seeks did not accrue at the time of his transfer, however, but only

We next consider the third step of the *Bowman* analysis: whether the City met its burden of showing that the same actions would have been taken in the absence of the protected activity. Since there were two CDA employees with less seniority than Praprotnik who would have also been candidates for the transfer, and the City produced no evidence justifying Praprotnik's selection over the less senior employees, the jury could have reasonably found that the City failed to meet its burden. Thus, there appears to be sufficient evidence in the record to support the jury's verdict on the first amendment claim with respect to Praprotnik's transfer and lay off.[9]

### Due process claim

In final argument to the jury, Praprotnik's counsel set forth his due process theory in the following terms:

> The due process issue evolves [sic] around the question: can a person be laid off for any reason or do they have to be laid off for reasons mandated by the charter and the ordinances of the City of St. Louis.
>
> The judge is going to instruct you that the St. Louis civil service employee can only be laid off for lack of work or lack of funds. If you find he was laid off for some pretextural [sic] reason, for some other reason, and if you look further and say, "This deprived him of his constitutional rights, his right to a job"—
>
> \*  \*  \*  \*  \*  \*
>
> So if somebody comes and takes your job in violation of the charter, then he is

entitled to what we call due process consideration.

We perceive Praprotnik's theory to be that a lay off for any other reason than those stated in the city charter *ipso facto* violates due process. The trial court's instruction, as requested by the plaintiff, appears to adopt the same theory. We cannot agree with this characterization of the reach of the due process clause. Although the due process clause substantively prohibits certain arbitrary, capricious, or irrational acts on the part of government, *Daniels v. Williams*, —— U.S. ——, 106 S.Ct. 662, 677–78, 88 L.Ed.2d 662 (1986) (Stevens, J., concurring), the mere fact that the government does not abide by the strict terms of its own rules does not necessarily imply that it has acted irrationally or for constitutionally improper reasons. *See State of Mo. ex rel. Gore v. Wochner*, 620 F.2d 183, 185 (8th Cir.1980). Thus, insofar as Praprotnik relied on a substantive basis for his due process challenge, it was error to submit this count to the jury.

For the first time on appeal, Praprotnik also suggests that his lay off was procedurally defective in violation of due process. In his brief he contends that the manner of his lay off failed to afford him adequate pretermination procedures and that the post-termination hearing permitted by the civil service rules was also unconstitutionally limited. In the ordinary, budgetary lay-off situation, however, individual pre-lay-off hearings are not necessary given the impracticality of imposing such a requirement. *See Smith v. Sorensen*, 748 F.2d 427, 435 (8th Cir.1984).[10] Further-

---

upon Thomas Nash and Robert Killen's decision to lay him off. Nash and Killen were thus necessary but not sufficient actors in the ultimate injury. We make this point to again distinguish this case from *Heller. See supra* note 3.

**9.** The City argues that a transfer can never form the basis of a constitutional deprivation since a City employee has no property interests in a particular assignment. This mischaracterizes the constitutional interests at stake here. Even if an employee has no property interests in a specific job, this court has recognized that "a transfer traceable to speech-related activity is properly the subject of first amendment chal-

lenge, even though the transfer resulted in no loss of pay, seniority, or other benefit." *Hughes v. Whitmer*, 714 F.2d 1407, 1421 (8th Cir.1983). This is because "involuntary transfers can be as effective as discharges in chilling the exercise of first amendment rights." *Bowman v. Pulaski County Special School Dist.*, 723 F.2d 640, 645 (8th Cir.1983).

**10.** In *Smith*, this court noted that "[t]he establishment of the [lay-off guidelines] involved an interpretation of Merit System rules by state officers faced with funding shortfalls," and reasoned that "[t]o require a hearing on the *possibility* that such an interpretation might be incor-

more, Praprotnik's failure to raise the procedural due process issue in the trial court precludes him from raising the issue on appeal for the first time. *See Singleton v. Wulff,* 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); *Cato v. Collins,* 539 F.2d 656, 662 (8th Cir.1976).

The remaining possible theory of recovery is that Praprotnik was denied due process because he was laid off in retaliation for his exercise of his first amendment rights. Assuming that this is the theory on which the jury did decide in his favor on the due process claim, the verdict could be sustained on the issue of liability. Because, as we next discuss, however, an award of damages on the due process claim would be improper, we nevertheless must vacate the due process verdict.

**Damages**

■ Where jury awards under two separate counts represent a duplication of damages, a plaintiff should be limited to recovery under only one count. *See In re IBP Confidential Business Documents Litigation,* 755 F.2d 1300, 1318 (8th Cir. 1985); *Morrill v. Becton, Dickinson and Co.,* 747 F.2d 1217, 1224 (8th Cir.1984). In this case, the jury rendered an identical $15,000 verdict under each count. The fact that the jury returned identical amounts in damages under each count convinces us that either an improper duplication is reflected in the verdicts or the jury awarded damages for a due process violation where no substantive claim is cognizable. Accordingly, we vacate the judgment with respect to the due process verdict and award, but affirm the $15,000 judgment on the verdict based on the City's violation of Praprotnik's first amendment rights.

**Jury instructions**

■ The City further contends that the trial court prejudicially erred by failing to submit three requested instructions to the jury. The City first requested that the

jury be instructed that "[a]n isolated incident of illegal conduct on the part of a municipality's agents, servants or employees is not sufficient to establish a governmental * * * policy such as would give rise to [municipal] liability * * * pursuant to 42 U.S.C. § 1983." The district court committed no error in not submitting this instruction since it is at best a misleading statement of the law. As *Pembaur* has made clear, an "isolated act" *may* give rise to municipal liability if the action is initiated by a person with authority to make policy on the matter. *Pembaur,* 106 S.Ct. at 1298–99. "Unless a requested instruction is entirely correct and may be given without qualification, there is no error in refusing it." *Brown v. Cedar Rapids and Iowa City Ry. Co.,* 650 F.2d 159, 165 (8th Cir.1981).

■ The City also objects to the trial court's failure to instruct the jury that a public employee generally has no property interest in a particular job assignment. Even assuming this is a correct statement of the law, it is irrelevant to any issue raised at trial. As we stated in *Feemster v. Dehntjer,* 661 F.2d 87 (8th Cir.1981), "This Court has long recognized that 'instructions may not in their language leave the way open to a jury to consider some question * * * which *is not an issue* or is not supported by the evidence." *Id.* at 89 (quoting *Fleming v. Husted,* 164 F.2d 65, 69 (8th Cir.1947)) (emphasis added in *Feemster* ). Praprotnik did not assert any claim premised on a property interest in his job at CDA in particular, nor is the existence of such a property interest relevant to any defense asserted by the City. Since the question raised by the instruction was therefore not in issue, the court did not err in refusing to submit it.

The third instruction requested by the City and refused by the trial court states that "[s]o long as there is substantial compliance with applicable personnel proce-

---

rect would considerably burden governmental decisionmaking." *Smith v. Sorensen,* 748 F.2d 427, 435 (8th Cir.1984) (emphasis in original). Whether this observation is still applicable in

light of *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), we reserve for another day.

dures, failure to strictly adhere to such procedures does not amount to a constitutional deprivation." Because we agree that Praprotnik's due process claim should not have been submitted to the jury, we need not pass on the propriety of the trial court's refusal to give the requested instruction.[11]

### Attorney fees

█ The district court awarded Praprotnik's attorney $10,000 in fees upon his motion that he be awarded $19,161 in fees. The court first reduced the requested sum by $936, compensation for work which the court found was not actually performed for the lawsuit. The remainder, $18,225, was deemed reasonably expended based on a reasonable rate. However, the court further reduced this amount to $10,000, apparently relying principally on the absence of "documentation evidencing a fee arrangement which would have allowed [Praprotnik's attorney] to retain more than one-third of plaintiff's award as fees for his services," and also noting the relatively small recovery, the failure to recover punitive damages, and the early dismissal of Praprotnik's claims under 42 U.S.C. §§ 1985, 1986. We discern no abuse of discretion in the district court's order, but remand the issue of attorney fees for reconsideration in light of our vacation of the award on the due process claim.

### Conclusion

The judgment on the verdict for $15,000 for the violation of Praprotnik's first amendment rights is affirmed; the judgment of $15,000 for the violation of due process is vacated; the claim for attorney fees is remanded to the district court for reconsideration.

ROSS, Circuit Judge, dissenting.

The majority reverses Praprotnik's due process verdict and affirms his first amendment verdict. I agree with the former decision but not the latter. In my view, the evidence adduced at trial was insufficient to support either a finding of municipal liability or a finding that Praprotnik's first amendment rights had been violated. In addition, at the very least, this case needs to be remanded for a trial on damages because the jury was given an improper instruction on compensatory damages.

### 1. Municipal Policy

Praprotnik alleges that the City of St. Louis has a policy of retaliating against employees who appeal adverse personnel decisions to the City's Civil Service Commission. He further alleges that the City acted in accordance with this policy when it transferred him in 1982 and laid him off in 1983.

Local governments may be held liable under 42 U.S.C. § 1983 for the execution of policies or customs "made by its lawmakers or those whose edicts or acts may fairly be said to represent official policy." *Monell v. Department of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978). As indicated by the majority opinion the more recent Supreme Court discussion on this subject is set forth in *Pembaur v. City of Cincinnati*, — U.S. ——, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

In *Pembaur*, the Court held that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Id.* at 1298. The Court then added:

Having said this much, we hasten to emphasize that not every decision by municipal officers automatically subjects the municipality to § 1983 liability. *Municipal liability attaches only where the decisionmaker possesses final authori-*

---

11. We recognize that in *Memphis Community School District v. Stachura*, — U.S. ——, 106 S.Ct. 2537, 91 L.Ed.2d 249 (1986), the Supreme Court held that it was error for a trial court to submit an abstract damage instruction on a constitutional claim. The damage instruction given by the trial court is nearly identical to the instruction found erroneous in *Memphis*. Unlike *Memphis*, neither party in the present case objected to the instruction at trial nor was the issue raised on appeal. Moreover, since the actual damages proved by Praprotnik exceeded $30,000, we are convinced the verdict award was not unduly prejudicial.

*ty to establish municipal policy with respect to the action ordered.* The fact that a particular official—even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion. * * * The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.

*Id.* at 1299–1300 (footnotes omitted, emphasis supplied). This policymaking requirement was illustrated in footnote 12 with an employment example directly applicable to this case:

Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policymaker, would give rise to municipal liability. Instead, *if county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner;* the decision to act unlawfully would not be a decision of the Board. However, if the Board delegated its power to establish final employment policy to the Sheriff, the Sheriff's decisions would represent county policy and could give rise to municipal liability.

*Id.* at 1300, n. 12 (emphasis deleted and added).

In this case, Praprotnik did not submit any independent evidence that the City has a policy of retaliating against employees for appealing personnel decisions. Instead, he relies solely on evidence relating to his own employment difficulties following his appeal of the suspension.[1] *Compare Williams v. Mensey,* 785 F.2d 631, 635 (8th Cir.1986) (prisoner's reliance on evidence concerning his own treatment in jail held insufficient to support inference of municipal policy). The majority concludes that this evidence is sufficient because the transfer and layoff decisions were made by "appointing authorities" who, under the City's civil service rules, may transfer and lay off employees under certain conditions subject to the approval of the City's personnel director.

There are two problems with the majority's analysis. First, the civil service rules relied upon, *see ante* at 1174, permit appointing authorities some discretion in making certain personnel decisions but do not grant them the power to set city personnel *policy.* That power remains with the mayor and aldermen through the passage of ordinances, and with the Civil Service Commission via its duty "[t]o consider and determine any matter involved in the administration and enforcement of * * * [the provisions of the City's Charter relating to civil service] and the rules and ordinances adopted in accordance therewith that may be referred to it for decision * * * on appeal by any * * * employee * * * of the city, from any act of the director [of personnel] or of any appointing authority." City Charter of St. Louis, Article XVIII, Section 7, paragraph (d). Because appointing authorities lack the authority to establish employment policy for the City, their decisions cannot constitute a basis for City liability. *See Pembaur v. City of Cincinnati, supra,* 106 S.Ct. at 1299–1300 & n. 12.

---

**1.** The majority fails to fully describe the suspension dispute, leading readers to infer that the fifteen-day suspension was wholly unjustified or that it involved a noble cause. In fact, the suspension was precipitated by Praprotnik's failure to obtain permission to perform architectural work for his own private clients. Praprotnik appealed this suspension to the St. Louis Civil Service Commission. The Commission set aside the suspension but reprimanded Praprotnik for not obtaining a clear understanding of the agency's secondary employment disclosure rules.

The second problem with the majority's analysis is that appointing authorities do not have "final authority" to make employment decisions. *Id.* at 1299. As recognized by the panel decision in *Williams v. Butler, supra,* 746 F.2d at 437: "In a situation where the victim of an unconstitutional employment decision and act is afforded redress by a procedure established by a local governing body, which could correct the injustice, that body can avoid liability for the unconstitutional acts of its officials—and the victims can be made whole." Here, the City's Civil Service Commission is available to review the employment decisions of appointing authorities and it is the Commission's decision which is final. *See* City Charter of St. Louis, Article XVIII, Section 7, paragraph (d) ("The decision of the Commission in * * * [civil service] matters shall be final"). The majority's determination that the Commission virtually rubber-stamps the decisions of appointing authorities is belied by the fact that Praprotnik took five appeals to the Commission between 1980 and 1983 and obtained relief from the Commission every time except on his appeal of the transfer decision. Moreover, he lost that appeal only because the transfer had not harmed him at the time of his appeal to the Commission.

### 2. First Amendment

Even if Praprotnik had submitted sufficient evidence to establish a municipal policy, the City cannot be properly held liable because the evidence does not support a finding that Praprotnik's first amendment rights were violated when he was transferred and laid off from city employment. The facts supporting Praprotnik's first amendment claim consist of the following. First, shortly after Praprotnik's appeal to the Commission in 1980, he began to receive poor performance evaluations and management had a different "attitude" towards him. Then, in 1982, he was transferred to a different city agency in a position of equal pay and equal grade.[2] Some of

Praprotnik's architectural duties were transferred to the new position but his superior at the new agency took those duties for himself. Thus, Praprotnik did not get to perform the type of work that he wanted to. Finally, in 1983, Praprotnik was laid off.

These facts are entirely insufficient to support Praprotnik's claim that he was transferred and laid off in retaliation for appealing the suspension decision. Evidently realizing that the evidence does not even begin to support a finding that the 1983 layoff decision was motivated by the 1980 suspension appeal, the majority relies solely on the transfer decision. The majority determines that the transfer decision was motivated by the suspension appeal because: 1) Praprotnik began to receive poor evaluations after the suspension, and 2) employee complaints to superiors about a particular situation (such as the secondary employment disclosure rules at issue in the 1980 suspension dispute, *see ante* at 1180, n.1) often cause adverse reactions by supervisors. The poor evaluations received by Praprotnik, however, did not cause the transfer, and step decreases and low ratings stemming from the evaluations were modified by the Civil Service Commission. Further, the decision to transfer Praprotnik was made by Frank Hamsher, a person who had not even been involved in either the suspension dispute or Praprotnik's appeal of that suspension. Hence, the evidence is just too weak and attenuated to support a finding that the transfer or layoff decisions were motivated by Praprotnik's appeal of the suspension decision.

The evidence also does not support a conclusion that the transfer caused the layoff. The majority infers that "it was only a matter of time until Praprotnik would have been forced to leave his position" at the new agency because he was only permitted to perform clerical functions. *Ante* at 1176. Yet, Praprotnik "lasted" over a year and a half at the new agency and has

---

**2.** Praprotnik's transfer occurred at a time when "major staff and budget reductions were made in Praprotnik's [former] agency." *Ante* at 1171.

In short, Praprotnik was not the only person who was transferred to a different agency in the spring of 1982.

given us every reason to believe that he wanted to continue his employment with the City at the time he was laid off. Praprotnik was apparently assigned only clerical duties at the new agency, but that was not a necessary result of the transfer. The problem with duty assignments arose only because Praprotnik's supervisor at the new agency, Henry Jackson, wanted to perform Praprotnik's architectural duties. This fact brings us back to the motivation issue. If Praprotnik is seeking to recover on the basis that he was constructively discharged by the duty assignment problem, he would have to show that Jackson was motivated by Praprotnik's suspension appeal when Jackson made the duty assignments. Praprotnik has not even attempted to make such a showing.