879 F.2d 1573
 58 USLW 2033, 4 Indiv.Empl.Rts.Cas. 872
 James H. PRAPROTNIK, Appellee,
v.
CITY OF ST. LOUIS, a municipal corporation, Appellant,
Frank Hamsher; Charles Kindelberger, Community Development
Agency; and Deborah Patterson, Community
Development Agency (Two Cases).
James H. PRAPROTNIK, Appellant,
v.
CITY OF ST. LOUIS, a municipal corporation, Appellee,
Frank Hamsher; Charles Kindelberger, Community Development
Agency; and Deborah Patterson, Community
Development Agency.
 Nos. 85-1145, 85-1267 and 85-1268.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 19, 1988.
Decided June 21, 1989.
Rehearing Denied July 28, 1989.
 
 Julian L. Bush, St. Louis, Mo., for appellant.
 Charles R. Oldham, St. Louis, Mo., for appellee.
 Before LAY, Chief Judge, BRIGHT and ROSS, Senior Circuit Judges.
 ROSS, Senior Circuit Judge.
 This case is before us after reversal and remand from the United States Supreme Court. City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). The Supreme Court, in a plurality opinion, held that this court had applied an improper legal standard for determining municipal liability, and reversed this court's finding that the City of St. Louis was liable under 42 U.S.C. Sec. 1983 for the decisions of its subordinate city officials to transfer and later terminate James H. Praprotnik, the appellee. See Praprotnik v. City of St. Louis, 798 F.2d 1168, 1173-75 (8th Cir.1986) (applying a standard under which a municipal "policymaker" is one whose employment decisions are not subjected to de novo review by higher-ranking officials). Applying the principles set forth in Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court concluded that municipalities, such as St. Louis, cannot be charged with the alleged wrongful actions of its employees unless the particular acting city officials in question have acted pursuant to an unconstitutional municipal policy and have been granted final policymaking authority for making policy in that area of the city's business under state or local law. Finding no evidence of an unconstitutional municipal policy or evidence that final policymaking authority actually rested with the supervisors responsible for Praprotnik's transfer and termination, the Supreme Court reversed and remanded the case for further review of the record and state law.
 On remand the parties were asked to further brief whether Praprotnik's layoff was ordered pursuant to an unconstitutional city policy by an official or officials with final policymaking authority or as the result of any such official's improper motivations. Oral argument was heard on September 19, 1988 and the matter was submitted for the court's consideration.
 DISCUSSION
 We begin by considering the guiding principles for determining when the acts of a city official will be considered the acts of the city itself for purposes of municipal liability under Sec. 1983. Those principles were summarized by Justice O'Connor in Praprotnik, supra, as follows:
 
 
 1
 First, * * * municipalities may be held liable under Sec. 1983 only for acts for which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to Sec. 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of state law. Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in that area of the city's business.
 
 
 2
 City of St. Louis v. Praprotnik, supra, 108 S.Ct. at 924 (quoting Justice Brennan's plurality opinion in Pembaur v. City of Cincinnati, supra, 475 U.S. at 480, 482-83 & n. 12, 106 S.Ct. at 1298, 1300 & n. 12) (citations omitted) (emphasis original).
 
 
 3
 The Supreme Court emphasized that final policymaking officials are to be identified by reference to state law (including valid local ordinances and regulations). "Authority to make municipal policy may be granted directly by a legislative enactment or may be delegated by an official who possesses such authority, and of course, whether an official had final policymaking authority is a question of state law." Id. 108 S.Ct. at 924 (quoting Pembaur v. City of Cincinnati, supra, 475 U.S. at 483, 106 S.Ct. at 1300). Thus, the Court concluded, "[T]here can be no justification for giving a jury the discretion to determine which officials are high enough in the government that their actions can be said to represent a decision of the government itself." Id. 108 S.Ct. at 925. The Court also emphasized that once the final policymaking officials have been identified under state law, the fact that such officials simply went along with a subordinate's discretionary decisions, without having investigated the basis for those decisions, does not constitute a delegation of the official's policymaking authority to the subordinate. Id. at 927. The Court noted, however, that:It would be a different matter if a particular decision by a subordinate was cast in the form of a policy statement and expressly approved by the supervising policymaker. It would also be a different matter if a series of decisions by a subordinate official manifested a "custom or usage" of which the supervisor must have been aware. In both those cases, the supervisor could realistically be deemed to have adopted a policy that happened to have been formulated or initiated by a lower-ranking official.
 
 
 4
 Id. (citations omitted).
 
 
 5
 Applying these principles to the evidence presented in this case, we conclude that Praprotnik failed to establish the elements necessary for holding the City of St. Louis liable under Sec. 1983. First, we find that the supervisors responsible for Praprotnik's transfer and layoff, CDA Director Frank Hamsher and H & UD Director Robert Killen, were not vested with final policymaking authority for making municipal policy in the area of personnel administration and layoffs. At most, these officials were entrusted with the authority for making discretionary personnel decisions in their departments.
 
 
 6
 Article XVIII of the St. Louis City Charter provides for a comprehensive system of personnel administration for the city. Under sections 3 and 7(a) of that article the Civil Service Commission (Commission) is empowered to make decisions with respect to the adoption, administration and enforcement of the city's civil service rules, i.e., rules and procedures for handling personnel and employment matters. See St. Louis Civil Service Rules, App. 41-105. See also Fleming v. Holland, 260 S.W.2d 840, 841-42 (Mo.App.1953) (recognizing the Commission's power to promulgate rules for the dismissal of an employee). The Commission is also authorized to make recommendations to the mayor and aldermen with respect to ordinances affecting personnel matters, to investigate issues affecting personnel administration, and to decide all employment matters raised on appeal from any act or decision by the Director of Personnel or appointing authority.[1] City Charter, Article XVIII, Sec. 7(b), (c), (d). In employment appeals, "[t]he decision of the [C]ommission * * * shall be final," subject only to an employee's right of action in a court of law.[2] Id. at Sec. 7(d).
 
 
 7
 Separate from the powers granted to the Commission under Sec. 7, the mayor and aldermen are granted the authority to enact ordinances, on recommendation of the Commission, which affect inter alia employee compensation rates, the civil service retirement system and appropriations to the department of personnel. See City Charter, Article XVIII, Secs. 4 and 7(b). Related to citywide layoffs, the board of aldermen also approves the city's annual budget, which is prepared and recommended by the city's board of estimate and apportionment.[3] See City Charter, Article XVI, Sec. 3. Where appropriations for salaries and compensation have been reduced by the board of estimate and apportionment, the board of aldermen is without authority to restore funding in order to avoid necessary layoffs in personnel. See City of St. Louis v. Smith, 360 Mo. 406, 228 S.W.2d 780, 783-84 (1950) (en banc). We also note that the mayor is without authority to order layoffs unless appropriations for salaries have been reduced by the board of estimate and apportionment. Id.
 
 
 8
 Thus, it appears that the Commission possesses primary policymaking authority for making general personnel policy and for making final decisions as to individual employees. Its decisions in these respects can fairly be said to be decisions of the city. The mayor and aldermen's policymaking authority, on the other hand, appears to be limited to personnel matters of a more broad, all-encompassing nature (e.g., compensation rates, retirement plans, department appropriations). As a general rule, decisions of the mayor and aldermen which specifically address and adversely affect individual employees are not "final" for purposes of Sec. 1983 because those decisions are subject to review by the Commission. See City of St. Louis v. Smith, supra, 228 S.W.2d at 784.
 
 
 9
 Clearly, Hamsher and Killen, who made the decisions to transfer and later terminate Praprotnik, did not possess final policymaking authority under the city's charter.[4] Only the Civil Service Commission had final policymaking authority for that area of the city's business. Further, we find no evidence that there was a delegation, official or otherwise, of the Commission's authority to any of the individually named defendants.
 
 
 10
 Second, we find no evidence of the existence of an unconstitutional municipal policy authorizing or otherwise permitting any form of retaliatory action against Praprotnik or any other employee for exercising the right to appeal an adverse employment decision to the Commission. We note that Praprotnik does not even assert that the Commission authorized or permitted such a policy.
 
 
 11
 Praprotnik's suit focuses on an alleged scheme,
 
 
 12
 that his supervisors were angered by his 1980 appeal to the Civil Service Commission;[5] that new supervisors in a new administration chose, for reasons passed on through some informal means, to retaliate against respondent two years later by transferring him to another agency; and that this transfer was part of a scheme that led, another year and a half later, to his lay off.
 
 
 13
 City of St. Louis v. Praprotnik, supra, 108 S.Ct. at 926. Neither this theory of the case nor the evidence presented at trial support a finding of Sec. 1983 municipal liability under the proper legal standard as set forth by the Supreme Court.
 
 CONCLUSION
 
 14
 We conclude that Praprotnik failed to make a submissible case of municipal liability under 42 U.S.C. Sec. 1983. Accordingly, we reverse the judgment of the trial court and remand the case for entry of judgment in favor of the City of St. Louis and against the plaintiff.
 
 
 15
 LAY, Chief Judge, dissenting.
 
 
 16
 I must, respectfully, dissent.
 
 
 17
 This case is here on remand from the United States Supreme Court. City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Certainly in the mind of a former City of St. Louis employee the denial of justice has come painfully and slowly. James H. Praprotnik was hired as an architect in 1968. There was never a complaint concerning his work; he is a skilled professional. In April of 1982 he was wrongfully transferred to a menial position for which he was over-qualified. In December of 1983 he was further abused by being laid off pretextually for lack of funds. He commenced his lawsuit on February 8, 1983, in federal district court in the Eastern District of Missouri. In a complex trial a jury was persuaded to find a wrongful discharge attributable to the City's unconstitutional action and awarded $15,000 for violation of plaintiff's due process rights and $15,000 for violation of plaintiff's first amendment rights. In a divided panel opinion, with Judge Ross dissenting, this court sustained the verdict for $15,000 on first amendment grounds but found the due process award duplicitous and based on erroneous instructions. City of St. Louis v. Praprotnik, 798 F.2d 1168 (8th Cir.1986).
 
 
 18
 The panel opinion (which I wrote) set forth in detail the involved facts, but erroneously held that plaintiff's department head Frank Hamsher, as Director of the Community Development Agency, had been delegated final authority to transfer and thus to effectively bring about plaintiff's ultimate discharge. Id. at 1174-76. It was on this basis our panel held that the verdict against the City on the first amendment charge could be sustained. Id. at 1177.
 
 
 19
 The Supreme Court granted certiorari for the stated purpose of better defining "the proper legal standard for determining when isolated decisions by municipal officers or employees may expose the municipality itself to liability under 42 U.S.C. Sec. 1983." 108 S.Ct. at 919. Unfortunately, this question is still somewhat undecided since the Court resolved the issues in a plurality opinion (O'Connor, J.), a concurring opinion (Brennan, J.) and a dissenting opinion (Stevens, J.). Justice Kennedy did not sit. Seven judges did agree our panel opinion erroneously found sufficient delegation in Hamsher to be an official policymaker of the City.
 
 
 20
 The split between the plurality and concurring judges related in part to whether state law was the determining factor of policymaking hierarchy, as the plurality held, or whether state law was simply a beginning place, with the ultimate determination of where such policymaking authority actually resides being left to the factfinder, as the concurrence advocates. Seemingly, a second point of disagreement arose over what constitutes "finality" in terms of an official's policymaking authority for, as Justice Brennan states: "the plurality suggests that whenever the decisions of an official are subject to some form of review--however limited--that official's decisions are nonfinal." 108 S.Ct. at 935. Justice Brennan urged instead:
 
 
 21
 Reviewing officials, however, may as a matter of practice never invoke their plenary oversight authority, or their review powers may be highly circumscribed. * * * Under such circumstances, the subordinate's decision is in effect the final municipal pronouncement on the subject. Certainly a Sec. 1983 plaintiff is entitled to place such considerations before the jury, for the law is concerned not with the niceties of legislative draftsmanship but with the realities of municipal decisionmaking, and any assessment of a municipality's actual power structure is necessarily a factual and practical one.
 
 108 S.Ct. at 935 (footnote omitted).[1]
 
 22
 Thus, as I read the law, Praprotnik, 108 S.Ct. 915, settles very little. It does determine that our panel decision was wrong, i.e., that "[b]ecause the court identified only one unlawfully motivated municipal employee involved in [Praprotnik's] transfer and layoff, and because that employee did not possess final policymaking authority with respect to the contested decision, the city may not be held accountable for any constitutional wrong [Praprotnik] may have suffered." 108 S.Ct. at 933 (footnote omitted).
 
 
 23
 The perplexing difficulty, however, is that the Court did not outright reverse the case. Instead of a straight reversal, the Court remanded the case for briefing and argument, according to the plurality, because, "[o]ur examination of the record and state law * * * suggests that further review of this case may be warranted in light of the principles we have discussed. That task is best left to the Court of Appeals, which will be free to invite additional briefing and argument if necessary." 108 S.Ct. at 928 (emphasis added). Justice Brennan's concurring opinion joins in the remand and simply states: "I concur in the judgment of the Court reversing the decision below and remanding the case so that the Court of Appeals may determine whether [Praprotnik's] layoff resulted from the actions of any improperly motivated final policymakers." 108 S.Ct. at 936 (emphasis added).
 
 
 24
 There is little question that the remand has perplexed the panel and counsel for both parties. I say this candidly, without intending any disrespect to the Supreme Court, but to emphasize our probable continued miscomprehension of making proper decisions in this long, drawn out and difficult case. My statement is directed to our inability to comprehend what remains. Is there still a possibility through a proper legal analysis that James Praprotnik can succeed and be properly recompensed for his damage? I must assume there are legal questions which can possibly be resolved in favor of plaintiff or else the case surely would have been simply reversed and not remanded.
 
 
 25
 Thus, I must disagree with my colleagues, for their opinion forecloses any possible legal basis for plaintiff to recover. The majority opinion simply reiterates what the Supreme Court previously determined: (1) that there exists no final policymaking in Hamsher or other supervisory personnel on which to premise liability of the City; (2) the City has no prescribed policy which details any unconstitutional procedures or process which affected plaintiff; and (3) that state law places final review concerning all personnel layoffs and transfers in the City's Civil Service Commission (Commission). Ante at 1575-76. Each of these rulings was set forth by the Supreme Court plurality opinion. Therefore, I respectfully submit the opinion now authored by Judge Ross resolves nothing upon which the Supreme Court has not passed.
 
 
 26
 The majority of the panel now holds that neither the mayor's nor the Board of Aldermen's policymaking authority is "final" for purposes of Sec. 1983 because any such decision is subject to review by the Commission. The conclusion drawn from this finding is not new, since Justice O'Connor acknowledges the Commission has final review of personnel decisions. The statement that the mayor and Board of Aldermen are not final policymakers, however, is new, and contradicts the observations of Justice O'Connor and Justice Brennan as well as Judge Ross in his earlier dissent.
 
 
 27
 I return to the beginning--what issues remain? From the consensus of the plurality and concurring opinions, there is reflected simply one question, as succinctly put by Justice Brennan: "whether [Praprotnik's] layoff resulted from the actions of any improperly motivated final policymakers?" 108 S.Ct. at 936. My answer is yes.
 
 
 28
 Monell allows the City to be found liable for any unconstitutional policies or customs, including actions "by those whose edicts or acts may fairly be said to represent official policy." Monell v. New York City Dept. of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037-38, 56 L.Ed.2d 611 (1978). Pembaur recognizes, in this regard, that special difficulties can arise when a municipal policymaker has delegated his policymaking authority to another official. Pembaur v. Cincinnati, 475 U.S. 469, 482-83, 106 S.Ct. 1292, 1299-1300, 89 L.Ed.2d 452 (1986). And the plurality noted that cases such as Praprotnik's exist in which:
 
 
 29
 policymaking responsibility is shared among more than one official or body. In the case before us, for example, it appears that the mayor and aldermen are authorized to adopt such ordinances relating to personnel administration as are compatible with the City Charter. * * * The Civil Service Commission, for its part, is required to "prescribe ... rules for the administration and enforcement of the provisions of this article, and of any ordinance adopted in pursuance thereof, and not inconsistent therewith." * * * Assuming that applicable law does not make the decisions of the [Commission] reviewable by the mayor and aldermen, or vice versa, one would have to conclude that policy decisions made either by the mayor and aldermen or by the [Commission] would be attributable to the city itself.
 
 
 30
 108 S.Ct. at 925.
 
 
 31
 I look first to state law. The mayor may order transfers and layoffs under the City Charter when the corresponding salaries have been reduced by the Board of Estimate and Apportionment. This board is comprised of the mayor, the comptroller and the President of the Board of Aldermen. Similarily, as the majority noted in a footnote,
 
 
 32
 section 2(a) of Article XVIII of the St. Louis City Charter requires the Civil Service Commission, as well as other official final policymakers, to ensure that all appointments to and separations from the city's civil service are "on the sole basis of merit and fitness * * *." Layoffs of employees of an indefinite tenure may occur at any time, however, "on termination of the need for employment" or for lack of available funds. See City Charter, Article XVIII, Sec. 3(f).
 
 
 33
 Ante at 1575 n. 2 (emphasis added). From the emphasized portion of the above passage it is clear that the City Charter itself contemplates the existence of other "official final policymakers" in addition to the Commission. Indeed, both the plurality and the concurring opinions recognize that such additional "official final policymakers" exist. 108 S.Ct. at 925, 935. Both opinions include the mayor and the aldermen in this categorization. Id. Yet the majority, relying on City of St. Louis v. Smith, 360 Mo. 406, 228 S.W.2d 780 (1950) (en banc), would hold that neither the mayor nor the aldermen qualify as final policymakers.
 
 
 34
 Smith involved the issue of what constitutes "available funds" as that term is used in Article XVIII of the City Charter, where it is stated, "[l]ayoffs of employees * * * may occur * * * for lack of available funds." See City Charter, Article XVIII, Sec. 3(f). Smith held that since the Board of Aldermen has the right in the first instance, when it initially considers an appropriation ordinance for salaries submitted by the Board of Estimate and Apportionment, to reduce the amount of any item therein, it similarily has the right to sua sponte reduce an appropriation once made when it is determined that monies are lacking. Smith, 228 S.W.2d 783-84. Smith does discuss the fact that the Commission is mandated by City Charter. However, I do not read Smith as broadly as the majority. Its holding simply defines: (1) the scope of the Board of Aldermen's authority to reduce appropriations recommended by the Board of Estimate and Apportionment and (2) what constitutes "available funds." In no way is Smith dispositive of the issue at hand.
 
 
 35
 The testimony concerning the transfer of plaintiff, which the jury found precipitated the layoff, as well as the testimony concerning the actual layoff, speaks for itself:
 
 
 36
 Q. And it was a decision that was made in the mayor's office and carried out by you; is that correct?
 
 
 37
 A. [Mr. Hamsher] It was a recommendation I made to the mayor, and the mayor concurred with it, and Mr. Nash and Mr. Jackson and myself carried it out.
 
 
 38
 [From deposition; read at trial] Q. [Mr. Oldham] Who would have the authority to take functions out of one appointing authority and move them over to another appointing authority? Who would have that authority?
 
 
 39
 A. [Mr. Duffe] Well, it depends on the situation. The Board of Estimate and Apportionment in some cases; in other cases it would be the mayor to the best of my knowledge.
 
 
 40
 * * *
 
 
 41
 * * *[Discussion of CDA's 1982 layoffs] Q. Did you voice your concerns to the mayor?
 
 
 42
 A. [Mr. Hamsher] Oh, yes.
 
 
 43
 Q. What was his reaction to your concerns?
 
 
 44
 A. He listened. He and I discussed it back and forth. And he was elected by the people so he made the decision.
 
 
 45
 Q. He said "Go ahead and lay off"?
 
 
 46
 A. Yes.
 
 
 47
 Q. [Mr. Oldham] [Y]ou indicated that you work for the mayor; is that correct?
 
 
 48
 A. [Mr. Hamsher] Yes.
 
 
 49
 Q. And doesn't the mayor keep a pretty tight rein on operations within the City?
 
 
 50
 A. Sure.
 
 
 51
 * * *
 
 
 52
 * * *
 
 
 53
 Q. Isn't it fair to say, Mr. Hamsher, that you initiated the [transfer], that you had sort of recommended it through the mayor's office, sort of pushed to get it done?
 
 
 54
 A. I wouldn't say I pushed to get it done. I recommended it to the mayor. The mayor made a decision. And when the mayor makes a decision, all of us who work for him try to carry it out.
 
 
 55
 * * *
 
 
 56
 * * *
 
 
 57
 Q. [Mr. Oldham] What's the total [HUD] budget for [1982] then?
 
 
 58
 A. [Mr. Praprotnik] The total budget for the year was $144,339.
 
 
 59
 * * *
 
 
 60
 * * *
 
 
 61
 Q. And what is the total budget for [1984]?
 
 
 62
 A. The total budget is a hundred and fifty thousand.
 
 
 63
 Q. So there's an increase of approximately $6,000?
 
 
 64
 A. Yes.
 
 
 65
 * * *
 
 
 66
 * * *
 
 
 67
 Q. Now, what was the reason given for your layoff?
 
 
 68
 A. Insufficient funds.
 
 
 69
 Q. Is that the only reason that they gave in your notice?
 
 
 70
 A. Yes.
 
 
 71
 108 S.Ct. at 941 n. 9; 943 n. 11 (emphasis added).
 
 
 72
 Here there should be little question that state law vests the mayor with the authority to transfer and layoff employees for lack of funds. See City Charter, Article XVIII, supra. There was ample evidence to show that in Praprotnik's case this proffered reason was pretextual. Although initially engineered by Hamsher, it was followed by the final policymaker--the mayor. The majority overlooks the fact that, as the plurality and concurrence recognized, the mayor and aldermen can both be final policymakers along with the Commission. 108 S.Ct. at 925, 935. In the case of the iniquitous transfer at hand which led to the layoff, only the mayor acted. Under the circumstances the evidence supports a finding that an official final policymaker participated in causing the harm to plaintiff. The jury had this evidence before it; the City therefore is liable.
 
 
 73
 It seems to me that in this case the majority engages in form over substance. In other words, because no articulated "policy" as such was ever espoused by the mayor himself, the majority would hold that no policy existed that could subject the City to liability. I think this misses the substance of the issue at hand. Surely no one subscribes to the theory advanced by the City on remand that Hamsher alone, or any other subordinate in the City's bureaucratic heirarchy, had the authority, without mayoral approval, to transfer or layoff Mr. Praprotnik. As I read the City Charter, it was impossible to affect plaintiff's tenure as a City employee without mayoral approval. To come now and say that no policymaker with the requisite "final" authority effected the transfer and ultimate layoff of Praprotnik is absurd. Yet the majority forecloses such a possibility when it holds that neither the mayor nor the aldermen possesses final policymaking authority. Ante at 1575-76. In my view the majority's holding today has the potential both for completely insulating municipalities from any possibility of liability in these types of cases and for unduly restricting the scope of municipality liability under Sec. 1983.
 
 
 74
 As I indicated, the Supreme Court remanded this case to us in lieu of merely reversing our earlier holding. The remand carried the express instructions that this court should determine whether anyone with final policymaking authority had a hand in plaintiff's transfer and layoff. The only possible entity implicated by the Supreme Court on remand is the mayor, since some person with the proper authority had to approve the transfer request and the ultimate layoff. In this case that person was the mayor. Therefore, utilizing either form of analysis articulated by the Court, i.e., state law exclusively or state law as a guidepost for the factfinder, I would hold that Praprotnik's layoff resulted from the actions of an improperly motivated final policyholder--the mayor.
 
 
 75
 I respectfully submit the issue of what constitutes municipality liability under Sec. 1983 concerning personnel decisions in cases such as this is far from resolved. It is for this reason that I sincerely hope the Supreme Court, which has already exhausted the facts, now with the addition of Justice Kennedy, will once again reexamine the compelling questions raised herein.
 
 
 
 [1]
 Under Article XVIII, section 1(a) of the St. Louis City Charter, " 'Appointing authority' means any person or group of persons having power by law or ordinance, or by lawfully delegated authority, to make appointments to any position in the city service * * *."
 
 
 [2]
 We note that section 2(a) of Article XVIII of the St. Louis City Charter requires the Civil Service Commission, as well as other official final policymakers, to ensure that all appointments to and separations from the city's civil service are "on the sole basis of merit and fitness * * *." Layoffs of employees of an indefinite tenure may occur at any time, however, "on termination of the need for employment" or for lack of available funds. See City Charter, Article XVIII, Sec. 3(f)
 
 
 [3]
 The board of estimate and apportionment is comprised of the mayor, the comptroller, and the president of the board of aldermen
 
 
 [4]
 We also find that Charles Kindelberger, Deborah Patterson, Henry Jackson, Thomas Nash, or any of the other subordinate city officials whom Praprotnik considered to be his supervisors, did not possess final policymaking authority under the city's charter
 
 
 [5]
 Praprotnik's assertion that the mayor and Praprotnik's supervisors retaliated against him for his testimony concerning the Serra Sculpture is not properly before this court. Praprotnik's amended complaint makes no reference to the Serra Sculpture or to retaliatory actions stemming from his testimony on that subject. The case proceeded under the theory that defendants retaliated against him for appealing his 1980 suspension to the Civil Service Commission
 
 
 [1]
 A close reading of Justice Stevens' dissent on this point would place him in accord with Justice Brennan, thus making the opinion 4-4 on defining when an official's decisions are final. As Justice Stevens states:
 If this case involved nothing more than a personal vendetta between a municipal employee and his superiors, it would be quite wrong to impose liability on the City of St. Louis. In fact, however, the jury found that top officials in the City administration, relying on pretextual grounds, had taken a series of retaliatory actions against [Praprotnik] because he had testified truthfully on two occasions, one relating to personnel policy and the other involving a public controversy of importance to the Mayor and the members of his cabinet. No matter how narrowly the Court may define the standards for imposing liability upon municipalities in Sec. 1983 litigation, the judgment entered by the District Court in this case should be affirmed.
 
 
 [108]
 S.Ct. at 936