Ben WORSHAM, Plaintiff–Appellant,

v.

The CITY OF PASADENA, et al.,
Defendants–Appellees.

No. 88–2770.

United States Court of Appeals,
Fifth Circuit.

Aug. 31, 1989.

David W. Showalter, Pamela Prince
Stines, Bellaire, Tex., for plaintiff-appellant.

Carnegie H. Mims, Jr., Houston, Tex.,
for defendants-appellees.

Before GOLDBERG, JOHNSON and
DUHE, Circuit Judges.

JOHNSON, Circuit Judge:

The instant case followed a tortuous procedural path before finally coming to rest before this Court. Briefly, appellant Ben Worsham filed an action under 42 U.S.C. § 1983. Among the defendants were the City of Pasadena and several city officials in their individual and official capacities. The jury returned a verdict for Worsham against some of the defendants. After originally denying defendants' motion for a new trial, the district court granted a new trial on the issues of liability and damages. All of the individual defendants were dismissed in their individual capacities; consequently, the new trial served to determine only the liability of the City.

The case was subsequently reassigned to another trial judge who granted the defendants' motion for dismissal pursuant to Rule 12(b)(6). Worsham filed a timely appeal to this Court alleging first, that the district court abused its discretion in granting a new trial. Second, Worsham argues

that even if a new trial was proper, the dismissal was not; consequently, he argues that the case should be remanded. We affirm the district court in all respects.

## I. FACTS AND PROCEDURAL HISTORY

Worsham's employment with the City of Pasadena, Texas (Pasadena), as a construction-site inspector, was interrupted when a letter from Mayor Jim Clark, dated February 2, 1981, imposed on Worsham an indefinite term of suspension. Although the letter cited insubordination as the reason for the suspension, Worsham maintains that the Mayor's action was the result of an ongoing dispute with Worsham's superiors concerning their approval of a certain construction project which he had opposed. Worsham appealed his suspension to the City Council, which reinstated him at a meeting held on March 3, 1981.

On March 31, 1981, Worsham filed an action pursuant to 42 U.S.C. § 1983, claiming that the suspension of his employment violated his constitutional rights.[1] By the time the case was tried, Worsham had named as defendants Pasadena, several city officials in their individual and official capacities, and a private real estate development corporation along with its principal owner.

A jury returned a verdict for Worsham against Mayor Clark and Public Works Director W.K. Thomasset, Worsham's supervisor. The court entered judgment against Clark and Thomasset in their individual and official capacities. The City was held liable for the actual damages awarded Worsham. Numerous post-trial motions were filed, including a motion for new trial, which the court denied. No liability was found against any of the other defendants.

After reconsidering his denial of the new trial motion, Judge Bue, who had presided over the trial of the case, granted a new trial in December of 1983, on the issues of liability and damages. Following the grant of new trial, all of the individual defendants were dismissed in their individual capacities. Consequently, the new trial served exclusively to determine the liability of Pasadena, both directly and as a consequence of the actions of city officials acting in their official capacities.

After Judge Bue's retirement, the case was reassigned to Judge Hoyt. On July 12, 1988, Judge Hoyt granted defendants' Fed.R.Civ.P. 12(b)(6) motion to dismiss. This appeal followed.

## II. CONTENTIONS ON APPEAL

On appeal, Worsham attacks the propriety of the grant of new trial as well as the 12(b)(6) dismissal. First, he contends that Judge Bue abused his discretion in granting a new trial; as an alternative to this assertion, Worsham argues that any justifiable alteration should have been effectuated in a more narrowly tailored manner by either an order of remittitur or, at most, a new trial on the amount of damages only. Finally, Worsham submits that even if the new trial order was appropriate, Judge Hoyt's 12(b)(6) dismissal of his case was not, and that remand for a new trial is appropriate.[2]

We find Worsham's arguments unpersuasive and affirm both the new trial order

---

1. Worsham originally based his complaint upon alleged violations of procedural and substantive due process. He later changed his theory to rely heavily upon alleged violations of his first amendment rights. Although defendants now take issue with Worsham's ability to add this claim, they objected neither to the introduction of evidence nor to the district court's charge. We consider defendants to have acquiesced in allowing this change of emphasis and to have waived any challenge which otherwise might have been raised on appeal.

2. In answering Worsham's claims, defendants maintain that we do not have jurisdiction to review the new trial order and may only determine the validity of the 12(b)(6) dismissal. Defendants contend that jurisdiction is absent because the appeal of the order granting a new trial occurred five years after the new trial was ordered. Defendants' argument that we lack jurisdiction to review the new trial order is contrary to our holding in *Wiggs v. Courshon*, 485 F.2d 1281, 1283 (5th Cir.1973). We do not agree that our precedent established by that case contradicts any decision of the Supreme Court. Accordingly, because we are following a well settled rule of this Court in rejecting the jurisdictional challenge, we consider it unnecessary to address the merits of defendants' argument.

and the 12(b)(6) dismissal. Since we affirm the new trial order *in toto,* we do not address the question of the appropriateness of a new trial on damages alone or of remittitur as an alternative.

## III. DISCUSSION

### A. *New Trial*

We turn first to the grant of a new trial on the issue of damages. A grant of a new trial for excessive damages will only be reversed if we conclude that the trial court abused its discretion. *Richardson v. Communications Workers of America,* 530 F.2d 126, 130 (5th Cir.), *cert. denied,* 429 U.S. 824, 97 S.Ct. 77, 50 L.Ed.2d 86 (1976). Where the grant of a new trial is based upon the insufficiency of the evidence supporting the verdict, our inquiry focuses upon whether the verdict was against the great weight of the evidence. *Shows v. Jamison Bedding, Inc.,* 671 F.2d 927, 930 (5th Cir.1982). If so, the trial court has not abused its discretion in ordering a new trial. In a situation where, as here, the size of the verdict, and not the evidence presented, rests as the basis for the new trial, we consider this to be "a matter for the trial court which has had the benefit of hearing the testimony and of observing the demeanor of the witnesses." Great deference must be accorded the trial court's judgment under these circumstances, and reversal occurs rarely. Reversal is appropriate only in "situations where we are pressed to conclude that there is 'plain injustice' or a 'monstrous' or 'shocking' result." *Solomon Dehydrating Co. v. Guyton,* 294 F.2d 439, 447, 448 (8th Cir.), *cert. denied,* 368 U.S. 929, 82 S.Ct. 366, 7 L.Ed.2d 192 (1961).

In this case, Judge Bue properly identified the standard to which he was bound in granting the new trial motion. He analyzed the damage award and the evidence supporting it and concluded that the award not only was against the weight of the evidence on this point, but also shocking to the conscience. Because of the nature of the constitutional violations involved, he determined that the damages issue was inextricably linked to the liability issue. Accordingly, he felt that a complete retrial was appropriate. We find no clear abuse of discretion in this disposition of the motion.

After Judge Bue's previous adjustment to eliminate attorney's fees and costs, the total award to Worsham was $400,000, the amount he had claimed as actual damages throughout the trial. Judge Bue determined that there was simply no evidence to justify such a large award; in addition to Worsham's inability to claim any lost wages because of the brief duration of his suspension, his assertion that he somehow had lost his ability to earn a decent living in the future was completely unsubstantiated.

The only evidence of any actual damages upon which an award could have been based was Worsham's own highly speculative and unsupported testimony regarding his emotional distress and ruined reputation. After reviewing the evidence that went to the jury, Judge Bue concluded that it simply could not support a $400,000 award of actual damages.[3]

We next turn to the grant of a new trial on the liability issue; the question is whether Judge Bue was justified in ordering a new trial on the issue of liability as well. In *Edwards v. Sears, Roebuck & Co.,* 512 F.2d 276, 283 (5th Cir.1975), we held that in "a case in which the issue of liability was strongly disputed, and where the trial court itself determined the award of damages to have been grossly excessive," it may be appropriate to require a new trial on both damages and liability. Furthermore, in *Richardson,* 530 F.2d at 130, we found that there was no "abuse of discretion in failing to limit the new trial to damages only," even though remittitur was arguably a more appropriately tailored remedy. We reasoned that the liability is-

---

3. Judge Bue also concluded, from Worsham's testimony to the effect that he was trying to make an example out of the defendants, that the award must have been largely punitive in nature. In the new trial order, the court noted that the jury had been instructed that it could not award punitive damages unless it first awarded actual damages, which it apparently had not done. Judge Bue concluded that the award consisted largely, if not exclusively, of impermissible punitive damages.

sue was inseparable from the damages issue, as there were multiple defendants whose liability for allegedly wrongful acts over a period of several months depended upon the application of principles of agency.

Although the facts of this case are not identical to those in *Richardson*, we believe that they are sufficiently analogous so that we will not disturb the trial court's discretionary determination that the two issues were too closely intertwined to justify retrial on the damages issue alone.

B. *Dismissal*

In reviewing the propriety of a dismissal pursuant to Rule 12(b)(6), this Court independently applies the same test employed at the trial level and asks whether it appears to a certainty that the plaintiff would not recover under any set of supporting facts which might be proved. *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Judge Hoyt correctly concluded that it did so appear. Dismissal pursuant to Rule 12(b)(6) was proper.

The district court supported its conclusion that Worsham had failed to state a claim on which relief could be granted by asserting that "[p]laintiff failed to state a municipal policy that deprived him of a constitutinoal right, failed to state more than a single instance of the alleged constitutional deprivation, assuming one existed, and failed to allege specific facts to overcome defendants' official immunity."[4]

 Section 1983 provides for liability to be imposed upon any person who, acting under color of state law, deprives another of rights or privileges secured by the Constitution. It is well settled that local government units are "persons" within the meaning of this statute. The constitutional deprivation, however, must have its origin in what can fairly be said to be a policy of the municipality. The premise that the theory of *respondeat superior* does not apply in section 1983 actions brought against a municipality has become well entrenched in

our jurisprudence. Municipal liability, based on the actions of city officials, exists only where it can be shown that the officials acted in accordance with an official government policy or firmly entrenched custom. *Monell v. City of New York Dep't of Social Services*, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978).

Justice O'Connor, writing for a plurality, recently reexamined the Court's basis for *Monell*'s rejection of liability based on *respondeat superior*.

Aware that governmental bodies can act only through natural persons, the Court concluded that these governments should be held responsible when, and only when, their official policies cause their employees to violate another person's constitutional rights. Reading the statute's language in the light of its legislative history, the Court found that vicarious liability would be incompatible with the causation requirement set out on the face of § 1983.

*City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 923, 99 L.Ed.2d 107 (1988). *Praprotnik* is one in a line of decisions since *Monell*, in which the Court has attempted to delineate when holding a municipality liable for acts of its officials constitutes impermissible vicarious liabilty, and when it amounts to permissible direct liability. As the Court first indicated in *Monell*, direct liability is appropriate only when an injury is inflicted by "lawmakers or by those whose edicts or acts may fairly be said to represent official policy." *Monell* 436 U.S. at 694, 98 S.Ct. at 2037.

Since the decision in *Monell*, the Supreme Court has considered several cases, similar to the instant case, involving isolated acts by governmental employees. The first case in *Monell*'s evolutionary lineage, *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985), indicates that a single incident of unconstitutional activity will not suffice to hold a municipality liable under *Monell* "unless proof of the incident includes proof that it

---

**4.** The district court's final articulated ground for dismissal was extraneous because all individual defendants had been dismissed in their individual capacities. The court should have

examined only whether the complaint stated a claim for municipal liability based upon the action or actions of these officials. We conclude that it did not.

was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Id.* 436 U.S. at 823–24, 98 S.Ct. at 2436–37.

■■ The plurality decisions in *Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and the more recent decision in *Praprotnik,* further discuss those circumstances under which a single act by a municipal officer can create municipal liability under section 1983. Our task is to determine whether such circumstances are present in the instant case. We conclude that they are not. Worsham argues that Justice Brennan's language in *Pembaur* that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," [5] precludes the dismissal of his complaint because the acts of the mayor of Pasadena and the City's director of public works caused him to suffer constitutional deprivations. We decline to accept Worsham's invitation to interpret *Pembaur* and *Praprotnik* in such a manner. Such an interpretation would offend the policy underlying *Monell* as well as the language and application of its progeny. Specifically, we note that in *Pembaur,* Justice Brennan's plurality opinion carefully confines the scope of potential liability for individual acts to those the city has "officially sanctioned or ordered." *Id.* This includes situations in which the actions complained of are carried out by officials who are "responsible for establishing final government policy respecting such activity." *Id.* 106 S.Ct. at 1299–1300.

This language is significant in two respects. First, it indicates that policymaking authority in areas other than the one implicated is not sufficient to impose liabili-

ty on the City. *Pembaur* established that no matter how much power an official has, no municipal liability exists if that official does not set the policy at issue.[6] Second, the language indicates that the employee must have *final* policymaking authority in that area. In *Pembaur,* Justice Brennan distinguished the exercise of power and discretion in the enforcement of a policy from the delegation of final authority to make that policy.

In *Praprotnik,* the Court provided further guidance as to where lies the boundaries between the two categories denominated in *Pembaur.* In her plurality opinion, Justice O'Connor stated that if an official's actions are subject to review procedures, there has not been a complete delegation of power to terminate city employees so as to create municipal liability under *Pembaur.*[7] A court, faced with the task of determining the existence, vel non, of municipal liability in a situation such as this, should "respect the decisions, embodied in state and local law, that allocate policymaking authority among particular individuals and bodies." *Praprotnik,* 108 S.Ct. at 928. Consequently, the issue of "whether a particular official has 'final policymaking authority' is a question of *state law.*" *Id.* at 924 (quoting the plurality in *Pembaur,* 475 U.S. at 483, 106 S.Ct. at 1300) (emphasis in original).[8]

In the instant case, local law provided for review of the decision to terminate Worsham through the vehicle of appeal to the City Council. The Council ultimately reinstated Worsham. The plurality view in *Praprotnik* compels us to conclude that the existence of this meaningful review by the City Council indicates that the city offi-

---

**5.** *Pembaur,* 106 S.Ct. at 1298.

**6.** We have applied this reasoning in past cases. In *McConney v. City of Houston,* 863 F.2d 1180, 1184 (5th Cir.1989), we held that isolated instances of unconstitutional conduct by officials who are not policymakers "are inadequate to prove knowledge and acquiescence by policymakers."

**7.** We note that Justice O'Connor's opinion indicates that the ratification of reviewable action of an official may, under limited circumstances, be deemed to create a municipal policy. How-

ever, the absence of such a ratification in the instant case forecloses the need for this Court to attempt to define the circumstances which must exist in order to create such a policy.

**8.** Under the *Praprotnik* plurality view, the existence of final policymaking authority is a question of state or municipal law, not one of fact. Justice O'Connor rejected the argument that the determination of final policymaking authority could ever be a jury question. While Justice Brennan's concurrence takes issue with this holding, we are compelled to follow Justice O'Connor's plurality opinion.

cials who discharged Worsham were not, in that respect, final policymakers.[9]

We note that a recent Eighth Circuit decision supports our interpretation of *Praprotnik.* In *Williams v. Butler,* 863 F.2d 1398 (8th Cir.1989) (en banc), the court concluded that the Supreme Court has conveyed a clear message that "an incomplete delegation of authority—*i.e.,* [where] the right of review is retained will not result in municipal liability." We agree with this interpretation. As Justice Brennan stated in *Pembaur,* "[t]he 'official policy' requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." *Pembaur,* 106 S.Ct. at 1298. (emphasis in original).

The existence of effective review procedures prevents the employees from wielding final responsiblity in the instant case. While Rule 12(b)(6) dismissal could be improper in some cases where it is based solely on a theoretical right of review because a plaintiff may be able to demonstrate that such review is ineffective and meaningless, this is not the situation here. The City Council, not the two officials, was the repository of final policymaking authority; the prospect of liability under *Monell* was therefore foreclosed.

## IV. CONCLUSION

As the Supreme Court noted in *Pembaur,* "*Monell* is a case about responsibility." Applying the *Monell* doctrine, as distilled by *Pembaur* and *Praprotnik,* to the instant case, we conclude that ultimate responsibility under these facts lies not with the named officials, but with the City Council. Worsham failed to state a claim for

municipal liability. For the aforementioned reasons, we affirm the district court's new trial order and the subsequent 12(b)(6) dismissal of Worsham's claim.

AFFIRMED.

GOLDBERG, Circuit Judge, concurring in part and dissenting in part:

As the majority aptly notes, this case comes to us with a convoluted procedural history. Eight years after appellant Worsham filed his original complaint, and seven years after a $400,000 judgment in Worsham's favor, the majority now affirms a dismissal for failure to state a claim.

Worsham's case may lack merit, and I agree that Judge Bue did not abuse his discretion in ordering a new trial. But since I do not agree that Worsham cannot possibly recover under any set of facts which might be proved, *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), I dissent from the majority's affirmance of Judge Hoyt's dismissal under F.R. Civ.P. 12(b)(6). Worsham should be given an opportunity to prove that the Pasadena City Council had absolutely delegated final policymaking authority to Mayor Clark when Clark indefinitely suspended Worsham on February 2, 1981. If Worsham could not make such a showing, he would lose on summary judgment, but such concerns are not before us today.[1]

My disagreement with the majority concerns the role of *fact* in locating "final policymaking authority" for purposes of determining municipal liability in an action under 42 U.S.C. § 1983. The majority holds that because local positive law—the City Charter and a municipal ordinance— provided for the City Council's review of

---

**9.** A finding that either the mayor or the public works director possessed final policymaking authority with respect to Worsham's termination is precluded, both as a matter of municipal law and as a matter of fact, by the existence of a meaningful review procedure which culminated in Worsham's reinstatement.

**1.** After the completion of the fact-finding process in this case, and before Judge Hoyt's dismissal, the Supreme Court issued its opinions that address the theory of municipal liability

concerning us today. *Pembaur v. Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *City of St. Louis v. Praprotnik,* 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988); *Jett v. Dallas Independent School District,* —— U.S. ——, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). We cannot expect Worsham to have anticipated these cases. Thus, although this case has already been to trial, the record before us is not exhaustive on the 12(b)(6) issue we face.

Worsham's suspension, and because the Council ultimately reinstated Worsham, neither the mayor nor the public works director could possibly have held final policymaking authority at the time of suspension so as to subject the city to § 1983 liability.

The majority states that its result is "compelled" by "Justice O'Connor's plurality opinion" in *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). First, I do not believe that *Praprotnik*'s three opinions send a message sufficiently clear to compel the majority's result. Second, I do not believe that Justice O'Connor's plurality opinion can hold all of the meaning imputed to it by the majority.

Recently, the Court explicated the meaning of the *Praprotnik* plurality decision in a five-Justice majority opinion. *Jett v. Dallas Independent School District*, — U.S. —, —, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Although *Jett* does not resolve all of *Praprotnik*'s uncertainties, the case clarifies important aspects of *Praprotnik*, and I address *Jett* below in the course of sketching the framework of municipal liability constructed by the Court.

### I.

A municipality is liable under § 1983 for acts violating federal law "which the municipality has officially sanctioned or ordered." *Pembaur v. Cincinnati*, 475 U.S. 469, 106 S.Ct. 1292, 1298, 89 L.Ed.2d 452 (1986); *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 924, 99 L.Ed.2d 107 (1988). A city may face § 1983 liability in two situations. First, a city may be liable if a city employee violates federal law, and a city policy, whether enshrined in positive law or resulting from practice, custom or usage, proximately causes the violation of federal law. *Monell v. Department of Social Services*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).[2]

Second, if an official who has final policymaking authority in the area at issue violates federal law either by promulgating a rule of general applicability, or by ordering or undertaking a particular action on a single occasion, the municipality is subject to § 1983 liability for the acts of the official. *Praprotnik*, 108 S.Ct. at 924; *Pembaur*, 106 S.Ct. at 1299–1300; *but see Pembaur*, 106 S.Ct. 1292, 1304 (Powell, J., dissenting) (policies are usually rules of general applicability, and Court improperly focuses on status of decisionmaker in determining liability).

A plaintiff may recover from a city on either the custom/policy or status theories because *Monell*, at its core, "is a case about responsibility." *Pembaur*, 106 S.Ct. at 1297. While the use of the term "policy" is sometimes problematic, the notion of municipal responsibility is not.

Whether a particular official has "final policymaking authority" is a question of state law. *Pembaur*, 106 S.Ct. at 1300; *Praprotnik*, 108 S.Ct. at 924. The role of state law appears to divide the Court severely in *Praprotnik*. Justice Brennan (the author of the *Pembaur* plurality opinion on this issue) in a three-Justice concurring opinion in *Praprotnik*, states that "state law will naturally be the appropriate starting point" for determining the actual location of final policymaking authority, 108 S.Ct. at 934, but that "any assessment of a municipality's actual power structure is necessarily a factual and a practical one." *Id.* at 935. Justice O'Connor's plurality opinion states that "a federal court

---

**2.** The majority cites *McConney v. City of Houston*, 863 F.2d 1180, 1184 (5th Cir.1989) in footnote 6, stating that in *McConney* "we held that isolated instances of unconstitutional conduct by officials who are not policymakers 'are inadequate to prove knowledge and acquiescence by policymakers.'" In fact, in *McConney* we simply held that evidence existed to support a jury verdict for the plaintiff in a § 1983 action against the city. 863 F.2d at 1187. The facts sufficient to prove the existence of a city policy will vary according to the circumstances of a particular case. Thus, for example, in *Grandstaff v. City of Borger*, we held that "the disposition of the policymaker may be inferred from his conduct after [a rampage, in several episodes, by police officers on the city's night shift].... [T]he subsequent acceptance of dangerous recklessness by the policymaker tends to prove his preexisting disposition and policy." 767 F.2d 161, 171 (5th Cir.1985), *reh'g denied*, 779 F.2d 1129 (5th Cir.1986), *cert. denied*, 480 U.S. 916, 107 S.Ct. 1369, 94 L.Ed.2d 686 (1987).

would not be justified in *assuming* that municipal policymaking authority lies somewhere other than where the applicable law purports to put it" (emphasis added). *Id.* at 925.

Justice Stevens wrote a separate dissenting opinion in *Praprotnik.* He would hold cities liable for "single acts by high officials" that violate federal law. *Praprotnik,* 108 S.Ct. at 948 (Stevens, J., dissenting). Justice Stevens' vote is certainly more consistent with Justice Brennan's fact-specific views than with Justice O'Connor's positive law orientation. Because Justice Kennedy did not participate in *Praprotnik,* the decision "settles very little." *Praprotnik v. City of St. Louis,* 879 F.2d 1573, 1581 (8th Cir.1989) (Lay, C.J., dissenting).

The role of review in a governmental structure, in determining the location of final policymaking authority, is central in *Praprotnik,* and is central in this case. The *Praprotnik* plurality states that "when a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." *Id.* 108 S.Ct. at 926.

Justice Brennan's concurrence reads the plurality opinion to suggest that "whenever the decisions of an official are subject to some form of review—however limited—that official's decisions are nonfinal...." *Id.* at 935. After reading the two opinions in *Praprotnik,* it would appear that, as Justice Brennan contends, the plurality holds that a positive law right of review may subordinate contrary facts: "ad hoc searches for officials possessing '*de facto*' policymaking authority would serve primarily to foster needless unpredictability in the application of § 1983." 108 S.Ct. at 928 (plurality opinion).

The *Praprotnik* plurality indeed states that "the identification of policymaking officials is not a question of fact *in the usual sense*" 108 S.Ct. at 924 (emphasis added). Five Justices, however, recently clarified

this rather cryptic statement in *Jett v. Dallas Independent School District,* —— U.S. ——, ——, 109 S.Ct. 2702, 2723, 105 L.Ed.2d 598 (1989):

> As with other questions of state law relevant to the application of federal law, the identification of those officials whose decisions represent the official policy of the local governmental unit is itself a legal question to be resolved by the trial judge *before* the case is submitted to the jury. Reviewing the relevant legal materials, including state and local positive law, as well as " 'custom and usage' having the force of law," *Praprotnik,* [108 S.Ct. at 924 n. 1], the trial judge must identify those officials or governmental bodies who speak with final policymaking authority for the local governmental actor concerning the action alleged to have caused the particular constitutional or statutory violation at issue.

*Jett* clarifies that the *Praprotnik* plurality uses the phrase "custom or usage" in two contexts in the municipal liability area. First, the plurality uses the phrase—which appears in the text of § 1983—in its original meaning: that a city policy giving rise to liability, although not authorized by written law, may exist in the form of a custom, usage or practice having the force of law. 108 S.Ct. at 926. In this regard, the focus is upon whether a custom, usage or practice by formally nonpolicymaking officials—as distinguished from a formal, written policy—allows a factfinder to infer that the city's policymakers have acquiesced in such conduct so as to give rise to municipal liability.

The *Praprotnik* plurality also uses the phrase "custom or usage" in a transformative manner as a method of proof. By proving a "custom or usage," a plaintiff may demonstrate as a matter of fact that an official is invested with final policymaking authority. This method of proof concerns the official's *status,* which implicates the basis for municipal liability in the executive context addressed in both *Praprotnik* and *Pembaur. Praprotnik,* 108 S.Ct. at 924 n. 1 (plurality opinion); *Jett,* —— U.S. at ——, 109 S.Ct. at 2723. Thus, if a city's

formal policymakers delegate final policy-making authority to formally nonpolicy-making officials, even in the face of positive law—for example, by abdicating a formal power of review over otherwise discretionary acts of formally nonpolicymaking officials—the city may be liable for the delegatee's act on a single occasion that violates federal law.

*Jett* also characterizes the "final policy-maker" determination as a threshold question of law for the trial judge. Because facts concerning custom or usage may play a role in such a determination, the trial judge, after *Jett*, is empowered to resolve factual disputes in its threshold inquiry. *Jett* thus envisions a role for the trial judge in this context similar, for example, to the role a judge plays in determining admissibility of certain evidence, or whether a matter is of public concern in the First Amendment context. *See Connick v. Myers*, 461 U.S. 138, 103 S.Ct. 1684, 1690–92, 75 L.Ed.2d 708 (1983). These inquiries may involve disputed factual issues that the judge is empowered to resolve. *Jett* rejects Justice Brennan's position that the "final policymaker" determination is a jury question, *Praprotnik*, 108 S.Ct. at 934 (Brennan, J., concurring).

There is an apparent tension between the *Praprotnik* plurality's positive law emphasis and, as *Jett* clarifies, the plurality's recognition of the role of custom and usage—a fact-bound inquiry—in determining the location of final policymaking authority. As a practical matter, if a city council has the final power of review over a mayor's decisions to terminate or suspend, a plaintiff is not likely to prove that the mayor exercises final policymaking authority in suspending a salaried employee. The mayor will likely have the *discretion* to terminate or suspend, but a single exercise of such discretion will not subject the city to liability. *Pembaur*, 106 S.Ct. at 1300 n. 12.

Whatever the positive law, however, if a plaintiff can prove as a matter of custom, usage or practice that a city council, for example, has never exercised its positive law power of review, and has accepted as a matter of course the decisions of the formally nonpolicymaking official, then the plaintiff may convince the trial judge that the council has actually and absolutely delegated final policymaking authority to the formally nonpolicymaking official by abdicating its power of review. If a city council subsequently exercises its substantive power of review for the first time after an unconstitutional suspension or termination by the delegatee, then at the moment of substantive review, the city council *in fact* retracts the authority that the council had given away (delegated) previously, in effect changing city policy by relocating the locus of actual final policymaking authority by its act of substantive review.

Municipal policymakers must be accountable, either through the political process or the judicial process. By delegating final policymaking authority, city policymakers can avoid political pressure. If factual proof cannot fill the gap, accountability through the judicial process will dissipate as well. The resulting political and legal insulation benefits no one—except the insulated governmental figures. Positive law, then, cannot reasonably act as the sole determinant of the location of final policymaking authority in every circumstance. While a federal court is not justified in *"assuming* that municipal policymaking authority lies somewhere other than where the applicable law purports to put it", *Praprotnik*, 108 S.Ct. at 925 (plurality opinion) (emphasis added), courts must entertain *proof* of a custom or usage in the face of positive law.

## II.

The majority focuses on the *Praprotnik* plurality's positive law emphasis, and on Worsham's reinstatement by the City Council, in holding that the mayor was not a final policymaker who could subject the city to § 1983 liability by violating federal law in a particular instance. On the record before us, the majority's holding is certainly appealing. Mayor Clark, on the recommendation of the public works director, indefinitely suspended Worsham on February 2, 1981 (Defendant's Exhibit 4). Pursuant to a Pasadena Ordinance (Defendant's Exhibit 2) and the City Charter (Plaintiff's

Exhibit 2), Worsham appealed his suspension to the City Council. The Council is constituted by six Councilmen and the Mayor. Under Section 13 of the Charter, the six Councilmen have the power to remove an indefinite suspension by a two-thirds vote. The Charter provides that the "action of the Councilmen on the question of the removal of such suspension and reinstatement shall be final." At a regular Council meeting on March 3, 1981, the Councilmen voted, four to two to reinstate Worsham.

Although its holding is quite sensical on this record, the majority—except to the extent that the council *in fact* acted to reinstate Worsham—ignores the role of fact in determining the location of final policymaking authority.[3] Certainly under Justice Brennan's view, and apparently under Justice O'Connor's view concerning the role of custom and usage, Worsham should be given the opportunity to prove that before the Councilmen exercised their final positive law power of review over Worsham's suspension on March 3, 1981, the Councilmen had in fact absolutely delegated final decisionmaking authority concerning suspensions to the mayor, at the time of the suspension, by abdicating their substantive power of review. If Worsham could make such a showing to the trial judge under *Jett,* Worsham could recover from the city for any legally cognizable injuries flowing from Mayor Clark's suspension of Worsham on February 2, 1981. Even if Worsham could not prove actual damages, he could recover nominal damages for retaliation against the exercise of his First Amendment rights. *Perry v. Sindermann,* 408 U.S. 593, 92 S.Ct. 2694, 2698, 33 L.Ed.2d 570 (1972); *Carey v. Piphus,* 435 U.S. 247, 98 S.Ct. 1042, 1053, 55 L.Ed.2d 252 (1978).

Proof of delegation would likely be exceptionally difficult for Worsham to adduce. Because suspended employees, under local positive law, have a *right* to appeal their suspensions, Worsham would be required to prove that the City Council had failed substantively to exercise its power of review in the past (custom and usage), or under Justice Brennan's view, that some particular fact gave rise to a permissible inference of an absolute delegation of final policymaking authority to the mayor.

However unlikely Worsham's ultimate chances of success may be, the majority, I believe, errs by denying him an opportunity to make the attempt. As I have noted, a city council may ignore its positive grant of power, then absolutely delegate such power to a formally nonpolicymaking city official, and as a *result* of, for example, a lawsuit's threat, take back what it gave away in an attempt to purge itself of its juridical sins. I do not suggest that the Pasadena City Council acted with such redemptive intent; the present record suggests otherwise. Likely success, however, is not necessary for a plaintiff to avoid a dismissal for failure to state a claim.

Judge Bue granted appellant Worsham leave to file his third amended complaint on October 19, 1984, after Judge Bue granted a new trial solely to determine municipal liability, and before Judge Hoyt dismissed the case. In the complaint, Worsham alleges that Mayor Clark "is a city officer who is the final authority or ultimate repository of city power" and that the mayor, public works director and city attorney "made and executed city policy and custom ... in depriving [Worsham] of his constitutional rights" (R. 104).

I agree that the record before us does not support liability under the reasoning of the plurality opinions in either *Pembaur* or *Praprotnik.* But Worsham's allegations in his third amended complaint are sufficient to state a claim under the theory of municipal liability addressed in *Pembaur, Praprotnik* and *Jett,* based on the factual possibilities, however unlikely, that I discuss above. *Conley v. Gibson,* 355 U.S. 41,

---

3. The majority's reliance on *Williams v. Butler,* 863 F.2d 1398, 1402 (8th Cir.1989) (en banc), is misplaced. In *Williams,* the five-judge opinion quoted by the majority held that the defendant was vested with final policymaking authority because the city, as a matter of fact, had absolutely delegated such authority to him. *Id.; see id.* at 1399 ("at the time of his election in 1969, Butler was given *carte blanche* authority to hire and fire his employees.... 'it had always been traditional' ").

78 S.Ct. 99, 2 L.Ed.2d 80 (1957). Since *Pembaur, Praprotnik* and *Jett* were decided long after trial in this case, and since we cannot expect Worsham to have anticipated the Court's decisions, Worsham should be given an opportunity to prove the theory of liability addressed in the Court's decisions. *See* note 1 *supra.* Because I believe that a Rule 12(b)(6) dismissal is unwarranted in this case, I dissent in part from the Court's decision today.